Argued and submitted July 16, affirmed November 27, 2013, petition for review denied March 14, 2014 (354 Or 840)

In the Matter of F. J. S., Jr.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

F. J. S.,
aka F. J. S.,
*Appellant.*

Clackamas County Circuit Court
090925J;
Petition Number 090925J05;
A153174

315 P3d 433

Megan L. Jacquot argued the cause and filed the brief for appellant.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F.

Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Father appeals a judgment terminating his parental rights to F on grounds of unfitness. ORS 419B.504. When F was one month old, the Department of Human Services (DHS) placed him and his half-siblings, P and H (mother's children from a previous relationship) in protective custody. At the time, mother stipulated that her mental health problems, lack of stable housing, and use of marijuana created a risk of harm to all three children.[1] Father stipulated that he had a history of substance abuse and domestic violence against mother and that he lacked safe and stable housing, all of which impaired his ability to competently parent F. Several months later, after both parents had engaged in services, DHS returned P and H to mother's care and F to father's care. Mother, P, and H moved in with father and F a few months later, but after an incident in which father became angry and struck P, DHS removed all three children from the home. From that point until the termination trial, father engaged in additional services, but failed to complete his anger management class and continued to exhibit an inability to control his anger.

DHS petitioned for the termination of father's parental rights in January 2012, and the case was tried over several days in July and August of that year. The court terminated father's parental rights, concluding that his anger and impulsiveness rendered him unfit as a parent and that F could not be reintegrated into his home within a reasonable time. On *de novo* review, we agree that, at the time of trial, father continued to exhibit volatility and problems controlling his anger, that those conditions were seriously detrimental to F, and that, given the persistence of those problems and F's need for permanency, F could not be reintegrated into father's home within a reasonable time. Accordingly, we affirm.

---

[1] Mother and father also have a child who was born after F; that child is not part of the proceedings before us on appeal. Mother's parental rights to P, H, and F were terminated as a result of the proceedings in this case, and she did not appeal those judgments. The juvenile court also terminated the parental rights of the biological father of P and H. He appealed the judgments relating to P and H, and we affirmed those judgments without opinion. *See Dept. of Human Services v. D. S. S.*, 257 Or App 837, 308 P3d 381 (2013).

## I.  FACTS

We find the following facts on *de novo* review. ORS 19.415(3)(a). We include facts that relate to mother and to F's half-siblings, P and H, to the extent that those facts are relevant to the issues on appeal in this case.

A.  *Background and initial DHS involvement; father's engagement in services.*

Father had a chaotic upbringing. He suffered physical abuse at the hands of his father (grandfather), who also abused alcohol. Father estimated that he had been in "400 to 600" fights as a youth, had engaged in cruelty to animals, and had frequent police contact as a juvenile, including arrests for drug possession, trespassing, and burglary. As a result of those arrests, he spent time on probation and underwent substance abuse treatment. Father was expelled from school in the tenth grade for fighting and possession of a knife, and was later kicked out of the military for underage drinking and driving under the influence of alcohol. Father also reported that he was charged with assault in 2004 for "physical aggression" against his domestic partner, but that his conviction was "diverted" after he agreed to participate in a batterer intervention program; he completed that program in 2005. Father acknowledged a history of physical aggression towards female domestic partners, as well as several incidents of verbally abusing mother, including one incident, in the spring of 2009, in which he pushed her.

Father and mother met in October 2008. Mother had two children, P and H, with her husband D, who was then incarcerated, but she and father became a couple and moved into father's parents' home in February 2009. Mother gave birth to F the following August while she was still married to D; father's paternity was established a few months later.

About two weeks after F's birth, DHS conducted a safety assessment because mother, who is bipolar, had stopped taking her medications and had expressed worry that she would harm her children and herself. DHS put a "safety plan" in place that allowed the children to stay in the home, with the grandparents acting as "safety service provider" and the "eyes and ears" of DHS. However, mother

soon left the grandparents' house because she did not feel safe around father, and moved into a hotel with P and H. Almost immediately, she contacted DHS and admitted to the agency that she could not care for the children and that they should be placed outside of her care while she received mental health treatment. DHS took P and H into protective custody and placed them in a foster home.

DHS then met with father, who still had F in his care. DHS agreed with father that F would be left at the grandparents' house if mother and father signed over guardianship of F to grandparents. Shortly thereafter, however, father called DHS because he had concerns that F might be at risk at the grandparents' house because of grandfather's alcohol abuse. Father also admitted that he abused alcohol and marijuana, struggled with anger management, and had committed acts of domestic violence, all of which prevented him from being an appropriate parenting resource. Father was very open and willing to engage in services to address those problems. DHS then took protective custody of F and placed him in a foster home.

The juvenile court took jurisdiction over the children and established a wardship in October 2009. In particular, the court took jurisdiction as to father based on his stipulation that he had a history of domestic violence with mother, that he lacked safe and stable housing, and that he had a history of substance abuse that impaired his ability to safely parent F. DHS referred father for an addiction recovery screening and conditioned F's return to father on father's ability to find safe and stable housing, address his substance abuse problems, and understand how his anger and aggression affected F. In addition, the juvenile court ordered father, among other things, to participate in a drug and alcohol evaluation, drug and alcohol treatment if recommended, a batterer intervention program, and parent education classes.

Parents were involved in an incident of domestic violence that same month. A police officer received a radio call to respond to a Portland club because father had threatened mother with physical violence. At the club, mother explained to the officer that earlier that evening father had been drinking and "talking negatively to her about their relationship."

Father pushed mother and mother pushed him back. The couple proceeded to the club and continued to drink. Father again spoke negatively about their relationship, and, when he asked mother a question and mother simply nodded her head, father retorted, "Don't nod your head or I'll break your neck." Mother left the club and somebody called the police. The officer took a report and transported mother to a DHS facility.

There was an additional report of domestic violence between mother and father a couple of months later. Mother filed a complaint with the police that father had threatened harm to her in a grocery store parking lot on a day when they both had been drinking. However, mother was later charged with filing a false police report after she told police that she had "made up the report."

Beginning in November 2009, father engaged in intensive outpatient drug and alcohol treatment with Lifeworks NW. During the program's intake assessment, father reported that he had had problems with alcohol and drug use, as well as domestic violence and anger management problems. Father participated in group sessions three times per week and an individualized counseling session weekly. Urinalyses (UAs) were required throughout treatment, and after father initially tested positive for marijuana, all of his subsequent UAs were negative. Father generally did well in treatment—he cooperated with counselors, challenged himself, and demonstrated motivation to regain custody of F. He did, however, struggle to regulate his emotions at times when he was overwhelmed by the requirements placed on him by DHS. In addition, he reported to DHS and his counselor that he drank alcohol in February 2010, shortly before he was scheduled to complete treatment. Father successfully graduated from treatment in March 2010.

Meanwhile, in January 2010, father began an anger management program at Men's Resource Center. Between mid-January and mid-March, father attended seven of eight classes, but his participation was described as "openly resentful." He showed a great deal of hostility towards "the system" and little interest in changing his thinking in that regard. His counselor also explained that "[h]e has a great deal of victim-stance and blaming which so far, is a block for him making real progress. At this point I would say

the likeliness of him benefiting from the class seems low." Father missed five of the next seven classes, and, when he did attend, he continued to sit quietly "looking very angry/ defiant" and continued to show hostility towards "the system." Father stopped attending classes and was terminated from the program.

During this time period (late 2009 to June 2010) father also completed a parenting training program at Parrott Creek Child & Family Services. Father showed progress during the course.

B. *The children's return to parents; father's assault on P; and father's engagement in additional services.*

In April 2010, DHS returned P and H to mother and F to father. Father lived in the grandparents' home with F. By September 2010, mother, along with P and H, had moved into the grandparents' home. Mother struggled with mental health issues, and she began leaving all the children with father for prolonged periods. One day in September 2010, father, who reported that he was experiencing high levels of stress, struck P in the face after discovering that P and H had "destroyed a room." Father later reported that his "brain snapped" and, although he did not remember exactly what had happened, he had been extremely angry with the children. Father's blow left a large bruise from P's cheek into his hairline.[2] Grandmother reported the incident, and DHS removed the children and placed them in foster care.

As a result of that incident, the juvenile court entered an amended judgment of jurisdiction based on father's stipulation that he "used inappropriate discipline on [F's] sibling, which creates a risk of emotional, psychological, or physical harm" and that "father's anger management issues interfere with his ability to competently parent [F] and place [F] at risk of emotional, psychological, or physical harm." The court ordered father, among other things, to engage in a batterer intervention program.

---

[2] As a result of that incident, father pleaded guilty to first-degree criminal mistreatment of P in July 2011, and was sentenced to three years of probation. Before he pleaded guilty, he missed a court appearance and was arrested for failure to appear in June 2011. As a result of that arrest, he was terminated from his employment.

Father returned to Lifeworks NW for additional drug and alcohol treatment beginning in October 2010. At intake, father reported to his new counselor, Luty, that he drank heavily for about two weeks after the children were removed. He also reported that he had been smoking marijuana daily. Luty and father agreed to a treatment plan that included weekly group sessions, biweekly individual counseling, random UAs, and a mental health evaluation. Luty indicated that father was motivated from the beginning to engage in treatment and eager to figure out what was "driving him to do some of his behaviors." Luty and father worked on the biological, psychological, social, and spiritual aspects of addiction with an eye toward father learning about the conditioning that causes triggers and how emotions relate to his behavior.

For about a year, father made good progress and did not have any major setbacks. However, near the end of November 2011, father reported to Luty that he had used marijuana to cope with stress that had been building in his life. Luty, who had planned to graduate father from treatment around that time and turn over further care to a mental health provider, informed father that he would need to complete another month of negative UAs to graduate from treatment. Father, upset with Luty for implementing additional requirements, indicated that he felt that Luty should trust him more because he had completed almost a year of negative UAs. Father stopped contact with Luty for a few weeks in December 2011, and then a UA in mid-January 2012 tested positive for marijuana metabolite. After the positive UA, father missed another UA and dodged Luty's phone calls, leading Luty to believe that father was occasionally using alcohol or marijuana.

On February 28, 2012, father arrived at Luty's office "enraged." He expressed that he did not like the extra UAs and demanded to know why they were necessary. When Luty reminded father that it was what they had "agreed upon" and was necessary given his probation and medications, father "responded with rage, slamming doors when I asked him to come up with a plan to complete the requirements." Luty could not reach father for the next month, and Lifeworks NW sent father a letter on March 21 indicating

that, if he did not contact Luty by April 4, his file would be closed. Father submitted to UAs between March 28 and April 25, and all were negative.

Luty graduated father from the program on May 9, 2012, indicating that father had learned about the "conditioning that causes triggers and the relationship of his emotions to his behavior." He also learned about tools to help him stay in recovery and avoid relapse and "has been good at practicing those tools." Luty noted that father would benefit from more outside support and daily reflection and that father's relapse potential was "fairly high" because father "is unwilling to do what will increase his probability to stay clean." At the termination trial, Luty testified that father's participation was excellent until the last couple of months, when his attitude changed.

Dr. Duncan performed a psychological evaluation of father a year earlier, in May 2011. Duncan's report indicated that father acknowledged having problems managing his anger and might be depressed. Father admitted to prior incidents of physical aggression towards female domestic partners and reported several incidents of verbal aggression towards mother and one incident of physical aggression.

In his evaluation, Duncan assessed father's general intellectual functioning as average to high-average and indicated that he was not suffering from any cognitive limitations. Generally, father had "poor insight into the historical factors contributing to his anger and addiction problems." Further, father acknowledged a history of verbal abuse towards domestic partners, he experienced anger issues while at work, and he externalized blame and experienced aggressive urges. Father, however, appeared at that time to be very motivated to receive help, increase his awareness, and learn more effective ways to deal with his anger.

Father's Personality Assessment Inventory (PAI)[3] profile, which Duncan deemed to be "likely a reliable and accurate indicator of [father's] emotional and personality functioning," revealed elevated clinical scores regarding

---

[3] According to Duncan, the PAI is a "344-item self-report measure of adult personality that is designed to provide information on a range of clinical variables, including psychiatric symptomatology, attitudes and interpersonal functioning."

items "tapping into chronic anger and poor behavioral controls." For example, his scores suggested that "he is highly responsive emotionally, typically manifesting rapid and extreme mood swings rather than more cyclic mood changes as seen in affective disorders." According to Duncan, individuals with a PAI profile similar to father "are likely to be chronically angry and will freely express their anger and hostility." Similarly, father's "clinically significant elevations *** suggest[] a person who is very prone to anger, often losing his *** temper with little provocation." Such an individual "may use anger to intimidate or control others and become furious when others criticize or obstruct him *** in some way." In individuals with father's profile, "control in anger often lapses" which can include sudden and unexpected "damage to property and threats to assault others." Duncan's assessment tools did not, however, register elevated scores in measuring "the relative magnitude of stress in the parent-child system."

In Duncan's clinical opinion, father's addiction, anger, and personality issues were the primary concerns in terms of "historical impact" on his daily functioning and parental fitness. Duncan explained that father's anger problems were longstanding and that he appeared particularly prone to incidents of verbal and physical aggression when in the "throes of his addiction." Duncan explained that father

"appears to be someone who is chronically angry and/or tense. His anger also has a tendency to build up over time. He appears to be someone who becomes easily angered and frustrated around other people, particularly those individuals he perceives as incompetent or 'stupid.'

"[Father] also appears to be someone who experiences extreme affective instability. Not only do his emotional states likely fluctuate, even within a short period of time, but such rapid fluctuations in his emotions have resulted in [father] experiencing periods of uncontrollable anger. *** [The] data further suggests that [father] remains prone to acting in an impulsive, angry and reactive manner. Therefore, further intervention is needed to address these maladaptive coping and behaviors that are most likely related to [father's] underlying borderline personality traits."

As indicated, Duncan also concluded that father has antisocial features to his personality functioning, reflected in his ongoing difficulties with authority and antisocial attitudes that have remained in place since father's late childhood or early adulthood. Father likely has "antisocial personality traits in addition to borderline features." Duncan diagnosed father with "Personality Disorder Not Otherwise Specified" with borderline and antisocial features.

Duncan noted certain cognitive strengths, particularly that father is "bright" and appeared very motivated to receive additional treatment to address his mental and behavioral issues. But Duncan also cautioned that, given the stressors in father's life, his "ongoing vulnerability" could lead to a relapse and angry or aggressive behaviors.

Ultimately, Duncan opined that father was not capable, at the time of the evaluation, of being a safe full-time parent without intensive treatment. He recommended a referral to a mental health therapist and suggested that cognitive behavioral therapy (CBT) or dialectical behavior therapy (DBT) would be the best approach for father. Duncan also recommended additional parenting services and "more specific approaches targeting his anger, aggression, [and] domestic violence related issues, such as anger management treatment and additional batterer treatment." Duncan explained that these services were necessary because father continued to struggle with "batterer issues" even after completing a batterer intervention program in 2005.

Duncan gave father a mixed prognosis, concluding that, although motivated to change, father was vulnerable to relapse while continuing to struggle with anger. He estimated that it would take a "period of months" participating in the recommended services for father to fully benefit from treatment.

At the termination trial, Duncan explained that father did not have any cognitive limitations to learning, but that he has ongoing problems with anger, aggression, impulsivity, and alcohol use and that he has difficulties coping when experiencing heightened stress. Given father's personality issues, Duncan explained that a longer course of treatment is necessary—in father's case DBT or CBT. Father's

longstanding anger problems relate to father's antisocial and borderline personality features. Duncan also opined that father is at biggest risk when using alcohol or controlled substances and that stress brought about by parenting is also a risk factor for his anger. He noted that putting a young child into father's care would exacerbate father's stress level. Duncan explained that it was realistic to expect that father would have completed the recommended services in the 15 months since his evaluation. He opined that father would need to engage for a lengthy period of time in any CBT or DBT before those skill sets would be "kind of owned by him"; whether he had internalized those skills would be indicated by improved coping, improved anger management, and improved judgment.

Father, with DHS's financial assistance, completed the intake process for anger management counseling at Oregon City Counseling (OCC) in August 2011. According to father's counselor, Olivero, the state-certified anger management course that father enrolled in required 48 weekly sessions and three months of follow-up. Father did not begin group sessions with Olivero until October, but initially participated in a positive manner. However, father missed eight to 10 sessions between February and April 2012 (about the time he stopped cooperating with services at Lifeworks NW). He indicated to Olivero that he had "transportation issues" which prevented his attendance. Father attended two sessions in mid-April on a "no charge/no credit" basis, meaning that he attended without paying and would not receive credit toward completion of the 48-week program. Father again stopped attending and was terminated from the program for nonattendance in May 2012, having attended 14 of the required 48 classes.

At trial, Olivero explained that father had contacted him on at least one occasion to explain that he had been having transportation problems and that father later called to see if he could change groups because the sessions conflicted with his work schedule. At the termination trial, father told inconsistent stories as to why he stopped attending. On one hand, he testified that his work schedule was in flux and conflicted with the sessions. He explained that Olivero had suggested that he put a hold on coming back to

the group until his permanent work schedule was finalized. Father explained that, when he contacted OCC before the termination trial to reengage in the program because his work schedule had solidified, OCC did not have a session available at a time that he could attend. Later in the trial, however, father testified that he stopped attending anger management counseling because Olivero was out on medical leave for a month and that the sessions "fell off [his] schedule" and conflicted with his work schedule.

When asked about the usefulness of the anger management course, father explained that the material in those classes was not very helpful to him, that he did not "necessarily" have a problem with domestic violence, and that he went to the sessions because he had to, not because he thought he would benefit from attending. However, father indicated that he had chosen "to try and take what I can from the course."

Father did attend and complete a course in DBT at Lifeworks NW in late 2011 and early 2012, but the record is silent as to the details of that treatment. There are no treatment records reflecting what occurred, and his therapist did not testify at the termination trial. Father testified generally that he had participated in DBT for about seven months, attending once a week for three hours. The record includes a certificate of completion for the course indicating that he completed the "Core Skills, Distress Tolerance, Emotion Regulation, and Interpersonal Effectiveness modules of the Dialectical Behavior Therapy group at Lifeworks NW." Father indicated that DBT was helpful to him. Father likewise testified that he received individual mental health therapy through Lifeworks NW in early 2012, but the record is devoid of any treatment records or testimony by his therapist.

C. *Father's continued anger control incidents.*

At the termination trial, several DHS workers testified about incidents in which father directed anger and frustration at them. A DHS worker who had weekly contact with father between October 2010 and April 2011 testified that, although father was "cooperative for the most part," he exhibited impulsive behaviors at times, which included

cursing and yelling when father was informed of something he did not want to hear. She explained that his attitude would vacillate between talking calmly about necessary services and expectations and him "getting very upset and verbally aggressive."

Another DHS worker who had worked with father in 2011 and 2012 testified about several incidents in which father verbally abused her. She recounted an incident in July 2011 in which father reacted to a scheduling mistake by verbally abusing her, clenching his fists, and slamming the door on the way out of the office, frightening "several people and several children" in the lobby. She also recalled conversations with father in the months before trial about F's possible adoption that resulted in father being so verbally abusive on the phone that she had to end the conversation. The worker explained that she had to continually set limits with father because of his anger. Father's continual verbal abuse led DHS to deliver a letter to him in June 2012 regarding his "ongoing pattern of behavior that is described as aggressive and threatening."

Another DHS worker who supervised father's visits with F recounted an incident that had occurred two weeks before trial. During a supervised birthday party for F's half-brother P at a park, P "slipped away." When father located P near a water spigot, he used an "overly stern" voice and "yanked at [P's] arm when he pulled him away from the spigot." When the caseworker approached father to discuss his reaction to P, father was too distracted to listen. The situation further devolved when, in father's view, one of the foster parents in attendance contradicted father in front of the children. Father "creat[ed] arguments with the foster parents" and cursed at them within earshot of some of the children. The caseworker ended the visit early, informing father that he was required to leave the park.

D.  *Father's circumstances at the time of trial.*

At the time of the termination trial, father was employed as swing shift supervisor for a sandblasting company. He continued to live in the grandparents' home. Grandfather had moved out of the house and into a motor home on the property about three months before the trial when

grandmother and grandfather separated. Grandmother had not filed for divorce.

E. *Father's relationship with F and F's circumstances at the time of trial.*

By all accounts, father's visits with F went well, and there is a strong bond between them. DHS workers who had supervised visits consistently stated that father expresses love and affection towards F. He consistently visited F and was able to set aside his needs in favor of F's needs. At the visits, he was consistent with F, brought appropriate snacks and gifts for him, nurtured him, and was attentive to F's cues. None of the DHS workers that supervised father's visits with F indicated any concern with his behavior towards F.

F has been in eight different foster care placements since the juvenile court took jurisdiction, but has been in the same foster home since April 2011. His current foster parents have been identified as an adoptive resource. By the time of trial, F had lived with father for about five of his 35 months. A psychological evaluation of F, completed in July 2011, concluded that he appeared to be functioning remarkably well in the face of the negative life events he had experienced. At the time, F was described as a typical two-year-old; he threw tantrums and exhibited some pinching and hitting behavior, but slept and ate well. He did not demonstrate a strong connection to his half-siblings. When he was evaluated by the local school district, he did not qualify for early intervention services. The psychologist, however, placed him at heightened risk for attachment difficulties given the multiple changes in caregivers. She concluded that he needed high levels of consistency, stability and routine, and permanency sooner rather than later.

One of F's foster parents testified that, when F came into her care in April 2011, F had some challenges. However, she reported that at the time of the termination trial F was a "typical" almost-three year old. He was affectionate, easily redirected, and appropriate with other children.

The DHS caseworker most recently in charge of the case testified that F needed permanency to be able to grow emotionally. She testified that F "challenges relationships"

and consistently tests to see if adults around him are going to remain part of his life.

## II. ANALYSIS

The juvenile court terminated father's parental rights for unfitness, ORS 419B.504. To terminate a parent's rights, the court must find by clear and convincing evidence that the parent is "unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." *Id.* Evidence is clear and convincing if it makes the existence of a fact "highly probable" or if it is of "extraordinary persuasiveness." *State ex rel Dept. Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007). A parent's fitness is measured at the time of the termination trial, *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006), and the focus of the test is "on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract," *State ex rel SOSCF v. Stillman*, 333 Or 135, 146, 36 P3d 490 (2001). In addition, termination of parental rights must be in the child's best interests. ORS 419B.500.

To determine if a parent is unfit, the courts engage in a two-step analysis. *Stillman*, 333 Or at 145. First, the court determines whether "(1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child." *Id.* "Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.'" *Id.* In evaluating the second step, the court must "evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.'" The "reasonable time" standard is child-specific—the period of time that "is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20).

On appeal, father raises two assignments of error, challenging the juvenile court's determination that father was unfit at the time of trial and the court's determination that F could not be returned to father within a reasonable time.

A.   *Conduct or condition seriously detrimental to child.*

Father contends that he ameliorated his substance abuse problem and sufficiently addressed his anger management issues such that his condition was not a detriment to F at the time of trial. In support, he points to treatment that he has completed, particularly treatment that resulted from recommendations in his psychological evaluation, including DBT and some CBT. He also contends that, when his two rounds of partially completed anger management classes are considered together, he has participated in several months of such classes. Father claims that, by the time of trial, he was capable of explaining appropriate coping strategies from treatment and has made enough progress to demonstrate that any lingering anger management problems do not pose a barrier to him parenting F. In particular, he points to his behavior in the months leading up to the termination trial as evidence that he has improved his ability to control his anger.

DHS responds that the juvenile court correctly determined that F, if returned to father's care, would be at serious risk of being physically abused or witnessing the abuse of others. In support, DHS points to father's long-standing history of domestic violence, physical abuse, and his acknowledged anger management problems to demonstrate that father poses that risk because he failed to complete anger management treatment and he continued to exhibit problematic behavior in the weeks leading up to the termination trial.

Based on the evidence adduced at trial, we agree that DHS proved by clear and convincing evidence that, at the time of trial, father suffered from a condition that was seriously detrimental to F. We consider all proven conduct or conditions in combination when evaluating a parent's unfitness. *State ex rel Juv. Dept. v. F. W.*, 218 Or App 436, 456, 180 P3d 69, *rev den*, 344 Or 670 (2008).

At the heart of this case is father's longstanding problem with controlling his anger, which has regularly led to verbal and physical abuse of others, and whether those problems persisted at trial to such a degree as to pose a serious detriment to F. Father's struggle with anger management and volatile behavior reaches far back into his past. Father had a volatile and violent childhood and early adulthood. He engaged in domestic violence with partners prior to mother, and was "diverted" to batterer intervention in 2004 because of domestic violence charges. Father's relationship with mother involved verbal abuse and, at times, physical aggression. Father has acknowledged on multiple occasions that he has struggled with managing his anger.

After the juvenile court took jurisdiction over F, father completed required parenting classes and drug and alcohol treatment. However, he failed to meaningfully participate in his anger management course in early 2010 and, in fact, his participation was described as openly resentful. Father stopped attending that course in early 2010 when F was returned to his care. Several months later, as stress mounted in his life, his "brain snapped" and he physically assaulted P, resulting in DHS's removal of the children and father's felony conviction. There is no indication that father was intoxicated or under the influence of illicit substances during that incident. As a result, the juvenile court ordered father to complete anger management treatment. Father, to his credit, immediately reengaged in drug and alcohol treatment and within months sought a psychological evaluation. Duncan recommended several services, and father engaged in those recommended services. Although he completed DBT, drug and alcohol treatment, and had some mental health therapy, he again failed to complete his anger management treatment.

Father's failure to complete his court-ordered and psychologist-recommended anger management treatment is not, standing alone, enough to demonstrate that he continues to display anger management issues. However, we conclude that that failure, when considered in light of his history, Duncan's evaluation that father needed intensive treatment to address his anger issues and remained "prone to acting in an impulsive, angry and reactive manner," and

his continued aggressive conduct up to the time of trial demonstrates that father continues to suffer from that condition.

Father's psychological evaluation is particularly important context to understand father's continued problems managing his anger. Duncan, who opined that father's PAI profile was likely to be a reliable and accurate indicator of father's emotional and personality functioning, concluded that father was likely to be chronically angry, that his anger builds up over time, and that rapid fluctuations in his emotions have led to father experiencing uncontrollable anger. Further, father was likely to remain prone to acting in an impulsive, angry, and reactive manner, particularly in times of stress. Duncan linked his maladaptive coping and behavior to his borderline personality traits, and recommended therapy to address his personality disorder, as well as treatment specific to his anger management issues.

In that context, father's inability to control his anger is particularly troublesome. The record in this case demonstrates that father completed many of the services that Duncan recommended. However, we have very little information about the details of father's DBT or his individual mental health treatment, and how those services might have alleviated some of the problems underlying father's anger issues. What we do have is father's failure to complete anger management therapy, which, since the beginning of this case, has been identified as critical to F's return to father. We also have significant evidence that father continued to exhibit instances of verbal aggression and physical manifestations of his anger after he stopped attending anger management classes at OCC in February 2012. In February 2012, he became "enraged" at Luty—someone he had a strong relationship with—and responded by slamming doors. There is significant testimony that father was verbally aggressive with DHS workers to an extent that they had to end interactions with him and continually set limits with him. Father's continued verbal abuse resulted in DHS delivering a letter to him less than two months before trial regarding his "ongoing pattern" of aggressive and threatening behavior. Further, F's foster parents discontinued father's community visits because they did not

feel comfortable with him once they were identified as an adoptive resource. Finally, shortly before trial, father verbally and physically overreacted to P wandering away in the park, and then argued with and cursed at the foster parents to the extent that DHS ended the visit early.

That behavior is consistent with father's pattern of reacting to stressful situations in an inappropriately aggressive manner. When considered individually or in the abstract, those incidents may not appear particularly significant, but, when they are considered in the context of father's psychological deficits and his historical pattern of behavior, the evidence is clear and convincing that father is prone to acting in an angry, impulsive, and reactive manner regardless of the treatment he had successfully completed at the time of trial.

We also conclude that the evidence is clear and convincing that father's condition was seriously detrimental to F. On appeal, father focuses on his positive interactions with F, his development of parenting skills, and the dearth of evidence that F suffers from any special needs. He explains that the evidence shows that, even though he still experienced episodes of anger, he was more often able to walk away and, "[w]hen he did get angry, no one got hurt." He also appears to rely on a lack of evidence that F was ever the direct focus of father's verbal or physical aggression.

As we have explained before, a child's apparent wellness at the time of trial, almost two years after he was removed from a parent's care, does not preclude a determination of serious detriment. *Dept. of Human Services v. C. M. M.*, 250 Or App 67, 78, 279 P3d 306, *rev den*, 352 Or 341 (2012). Moreover, a parent's conduct or condition can be seriously detrimental based on the potential for harm. *Id.* In this case, the evidence shows that father still demonstrates the volatility that has historically plagued his actions and has resulted in physical and verbal aggression. Moreover, that volatility and aggression has previously resulted in an assault on a child in his care. Further, at the time that assault occurred, father had completed drug and alcohol treatment and parenting classes, but had stopped attending anger management classes—just as he had at the time of trial.

Father's apparent reliance on the fact that F has not directly experienced father's lack of anger control is not persuasive. F had only been in father's care for five of his 35 months of life, and the remainder of father's contact with F was in a supervised setting. Instead, the evidence is that father has previously assaulted a child in anger during a stressful period of his life and he has not completed the treatment most directly aimed at addressing the problem that led to that assault. Moreover, father continues to express anger inappropriately when experiencing stressful events. Therefore, given father's history of reacting with physical violence to a child in his home, and his demonstrated failure to address his anger issues through recommended treatment or otherwise, we conclude that father's volatility and problems managing his anger are seriously detrimental to F.

B. *Integration of F into father's home within a reasonable time*

We now address the second step of the two-part inquiry: whether integration of F into father's home is improbable within a reasonable time due to conduct or conditions not likely to change. ORS 419B.504. Father contends that DHS, specifically with regard to his anger management issues, did not make reasonable efforts to enable his reunification with F. He also argues that, given the "uniformly supportive reviews" of his treatment providers and his demonstrated progress in treatment, even if he were to require additional treatment, he could complete that within a time reasonable for F to be returned to his care. More specifically, he contends that he presented a viable plan for the return of F to his care and custody and that, because F is doing well and bonded to both his foster parents and father, a reasonable time for F would include the time required for father to complete additional services.

DHS counters that the record demonstrates that integration of F into father's home is unlikely within a reasonable time for F. In particular, DHS focuses on father's repeated failure to complete court-ordered anger management services, even though F has been in foster care for all but five months of his life. DHS also points to evidence that F is at risk of attachment problems, and contends that father does not acknowledge that he would benefit from further treatment.

The reasonableness of DHS's efforts depends on the particular circumstances of each case. *State ex rel Juv. Dept. v. S. W.*, 231 Or App 311, 327, 218 P3d 558, *rev den*, 347 Or 446 (2009). As to DHS's efforts, father's only contention on appeal is that his attempts to complete anger management were stymied by DHS's refusal to provide financial assistance. The evidence does not support father's contention. Even if we ignore the multitude of other services that DHS provided to father over the course of its involvement in this case, there is no evidence that father discontinued anger management class because of DHS's lack of financial support.

After receiving financial assistance from DHS to complete the intake process with OCC, father attended classes for awhile and then stopped. The evidence as to why he stopped is inconsistent. Father testified that he stopped attending classes because his counselor was on medical leave and the classes conflicted with his fluctuating work schedule. Olivero indicated that father had explained that he was having transportation problems. Although father's attendance in April 2012 on a "no credit/no charge" basis provide some indication that he could not pay for the class at that time, there is nothing to support father's contention that he communicated his financial need at that time to DHS. In fact, the DHS caseworker in charge of his case testified that father did not indicate any need for financial assistance after he completed intake at OCC and that, had he done so, DHS could have assisted him. Accordingly, we reject father's contention that DHS failed to make reasonable efforts.

We also conclude that there is clear and convincing evidence that F could not be integrated into father's home within a reasonable time for F. To his credit, father has engaged in many services over the course of this case and is, by all accounts, bonded and appropriate with F in a supervised setting. The record indicates that he has made improvements in many aspects of his life. Nevertheless, as discussed, father continues to demonstrate a condition that poses a serious detriment to F—his volatility and lack of control over his anger. It is unclear whether father is capable of sufficiently addressing his anger management problem, but

in all events, he has failed to complete treatment within a time that is reasonable for F. Father had almost three years to address the problems that resulted in F being removed from his care, and father recognized early on that his anger management problems were a significant barrier to his ability to parent. Nevertheless, father has not successfully addressed those problems, and doing so—if father is capable of effecting a lasting change in that regard—would take at least several more months of treatment.

Given that DHS has proven that father has not effected a lasting change and that the best-case scenario would require several more months of treatment, we conclude that it is improbable that F can be integrated into father's home within a reasonable time. We recognize that F was doing remarkably well when he was evaluated in July 2011, even in the face of the "negative life events" that he had experienced at that point, and that, according to his foster parent, he has done well in his current placement. However, we do not take F's lack of special needs and apparent adjustment to his circumstances as evidence that F can wait several more months for permanency. F's psychological evaluation indicated that F is at risk for attachment issues and recommended permanency sooner rather than later. Although F has been in a consistent placement since April 2011, he experienced an extraordinary number of placements in the first year and a half of his life. The DHS worker in charge of this case has observed that F challenges relationships and consistently tests adults to see if they will remain a part of his life. Given the length of time involved in this case and that father's anger management problems are of longstanding duration and the prospects for their remediation are doubtful, and keeping in mind that, "[a]t some point, the child's needs for permanence and stability in life must prevail," *State ex rel SOSCF v. Lehtonen*, 172 Or App 584, 594, 20 P3d 210, *rev den*, 333 Or 73 (2001), F cannot be integrated into father's home within a reasonable time for F.

Affirmed.