Argued and submitted January 19, reversed and remanded with instructions
November 1, 2000

In the Matter of Lovana Caldwell,
aka Lovana Lucas, Caltrece Lucas
and Lovana Maryl Lucas,
a Minor Child.

Lovana CALDWELL,
aka Lovana Lucas, Caltrece Lucas
and Lovana Maryl Lucas,
*Appellant,*

*v.*

Calvin LUCAS
and Tiana Caldwell,
and State ex rel State Office for
Services to Children and Families,
*Respondents.*

(9604-80942; CA A105253)

13 P3d 560

Kathryn Worden Underhill argued the cause for appellant. With her on the briefs was Juvenile Rights Project, Inc.

Caryanne Conner argued the cause and filed the brief for respondent Calvin Lucas.

Kathryn G. McNannay filed the brief for respondent Tiana Caldwell.

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Michael C. Livingston, Assistant Attorney General, filed the brief for respondent State Office for Services to Children and Families.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Kistler, Judge.

LANDAU, P. J.

`

## LANDAU, P. J.

Child appeals an order denying her petition for termination of parental rights. We reverse and remand for entry of an order terminating both mother's and father's parental rights.

On *de novo* review, ORS 419A.200(5), we find the following facts. Child was born on March 31, 1996. Mother, who was 17 at the time of the birth, had been involved with father, then 34, for approximately five years. Both parents have long histories of drug dependency and domestic violence.

Mother began smoking substantial quantities of marijuana at age 14 and has continued to do so since then; she does not see her drug use as a problem. She smoked marijuana regularly throughout her pregnancy. She also engaged in violent conduct during the pregnancy. On one occasion, she broke several windows after fighting with father. On another occasion, she stabbed a woman three times with a box cutter and was charged with third-degree assault.

Mother tested positive for THC at the time of child's birth. She also demonstrated a marked unwillingness to care for child. She often refused to feed child unless she felt like it and would demand that nurses do it for her when she felt tired. Following discharge from the hospital, mother refused to make a follow-up appointment. Based on those actions, along with the results of the drug testing, the State Office for Services to Children and Families (SCF) petitioned for, and obtained, temporary custody of child. Mother absconded with child, but eventually was arrested and revealed child's whereabouts. Child was placed in foster care, and parents were allowed supervised visitation.

Meanwhile, in September 1996, mother was convicted of the assault charge and sentenced to two years' imprisonment in the custody of the Department of Corrections. Fourteen months later, mother was released to a halfway house, but she fled and was later arrested and reincarcerated for violating the conditions of her release.

During her incarceration, mother had considerable difficulty with other inmates and with staff. She was physically and verbally confrontational and was described as "dictatorial," "demanding," and "selfish." She attended classes designed to help her deal with her anger, but she participated half-heartedly at best, and her instructors expressed serious doubts as to her willingness to change. While incarcerated, mother did visit with child.

Upon her release in 1998, mother continued to visit with child. But the human resources assistant assigned to supervise the visits commented that mother showed little affection and appeared to have no bond with child at all. She also enrolled in a weekly anger management class, but attended only twice. She admitted to her evaluator that she gets violent when angry.

Father has six children by various women. Child is his youngest. Like mother, he has a long history of drug use. He was convicted of possession of cocaine in 1984 and received a sentence of five years' probation. In 1989, he was charged with assault. Meanwhile, he was charged with possession of marijuana and with violating the terms of his probation. He pleaded guilty to the assault charge in return for dismissal of the other charges.

In September 1996, at the time mother was first incarcerated, child was released from foster care to father on condition that he remain in contact with SCF. In January 1997, police officers executed a search warrant at an apartment at which father was staying the night with his children, including child, then ten months old. The apartment apparently served as a drug house for the distribution of crack cocaine, was dirty, and smelled of marijuana and crack. The upper story of the apartment also housed drug operations, but recently had been destroyed by fire. Child was in a bedroom, but there was only one dirty mattress on the floor on which she could sleep; the other children were on a couch in the living room. One of the adults in the house attempted to flee the officers by breaking out of the window in the bedroom. Some of the shattered glass fell on the mattress where child was sleeping. The officer who chased the fleeing adult drew his weapon, but child was in the line of fire. The officers

searched the bedroom and found, among other things, an unloaded .38 caliber revolver and bindles containing crack cocaine residue. Shortly thereafter, SCF returned child to foster care and permitted supervised visitation only.

In December 1997, police officers executed another search warrant at a residence at which father was staying with his other children. Father was arrested and charged with possession of cocaine. At the residence, the police found multiple weapons, cocaine, and marijuana. Father pleaded no contest to possession of cocaine and was placed on two years' probation.

One of father's other children reported to CARES Northwest that she had seen drugs, which she referred to as "white rocks," at the family residence. She told CARES evaluators how the drugs were made, using boiling water, baking soda, and vinegar. She also reported that she observed father with "weed," which he rolled into a cigar and smoked. Tracey Carey, one of father's girlfriends and mother of three of the other children, testified that father prepared crack cocaine at home, boiling it on the stove in mayonnaise jars, packaging it in baggies, and selling it to customers, including teenagers. Father denies any involvement in the manufacture of crack cocaine. He contends that all of his arrests are the result of the police planting drugs and guns. We find father's denials not credible.

Father also has a long history of domestic violence. In 1990, he assaulted Veronica Avent, the mother of two of his other children, breaking her jaw. He admitted kicking and punching her, but he claimed not to remember the extent of her injuries. The incident resulted in a charge of assault, to which he pleaded no contest and was placed on probation for three years.

During the next several years, father lived with Carey, whom he also assaulted. During one incident, father took Carey into the bathroom and stuffed a towel in her mouth so that the children could not hear Carey cry as father beat her in the head with his fist. In other incidents, father forced Carey to take off her clothes, beat her with a belt or with an extension cord, and then locked her in a small room. There is no evidence that any children were present during

these beatings; indeed, on at least one occasion, father made a point of having someone take the children out of the home so that they would not see the beatings. In another incident, father rammed Carey's head into a wall and kicked her in the face. She attempted to escape, running down the street. A neighbor called the police, but by the time they arrived, father had caught up with Carey. He told Carey to cover her face and not let the police see her. He then told the officers that someone else had done the beating and that he was taking her home. Carey told the officers that that was not true, and father was arrested for assault.

While father and Carey lived together, father also "disciplined" two of his children by whipping them with a belt. He kept guns and knives in the home and let his four-year-old son play with an unloaded revolver. He also allowed the boy to watch "sexually inappropriate television programs."

Father also beat mother, once with a belt when she was pregnant with child. Father was arrested for that incident and charged with assault. More recently, father and mother fought in the middle of the street, father shoving mother and "yanking her around" by the hair. The police responded to that incident, as well.

Father admits that he has a problem with women. He also admits that he needs treatment, although he has yet to participate in any. He does not understand, however, why his propensity to engage in violent acts towards women should affect his ability to be a good parent to his children.

In spite of the foregoing problems, it appears that father cares for his children. Teachers of two of the other children reported that both are well adjusted and studious and that father showed an interest in their education. Father regularly attended parent-teacher conferences and, at least once, went to school on his own initiative to discuss his children's progress with their teachers. He helped chaperone his son's class field trips.

Father's relationship with child seems similarly positive. He rarely missed a visit and called when he could not make an appointment. The human resources assistant

supervising the visits reported that, although initially father's other children did most of the care during the visits, father later had become more attentive. Father related well with child, brought food, clothing, and toys to the visits, and generally appeared to have a strong bond with child.

In April 1997, the court ordered father to complete various evaluations, counseling sessions, and classes. Father refused. Meanwhile, mother once again disappeared, leading to the issuance of a warrant for her arrest. Child was found subject to the jurisdiction of the juvenile court and assigned to nonrelative foster care.

On July 13, 1998, child's attorney filed a petition under ORS 419B.500 to terminate mother's and father's parental rights on the ground that, among other things, they are unfit. ORS 419B.500 provides that the "state or the child" may file such a petition. Father moved to dismiss the petition on the ground that the statute permits only child, not child's attorney, to file a petition for termination of parental rights. The trial court denied father's motion.

At trial, testimony was adduced as to the foregoing facts. In addition, child offered testimony of a psychologist, Dr. Kitch, who examined father. Kitch reported that father's prognosis for maintaining any relationship free of domestic violence was poor, as was his prognosis for maintaining a life free of drug abuse. Kitch stated that he would have serious concerns about placing child in father's custody because of father's continuing relationship with mother, his history of domestic violence, his criminal history, and his longstanding pattern of drug abuse.

The trial court characterized this as "an extremely difficult case." It found that:

> "[Father] has not been honest with the court. There is no question about that. [Father] has a criminal record, moderately significant criminal record. And I am convinced that he has been involved in the manufacture and distribution of drugs. But he's never been convicted of that. I think that he is. I believe that part of what I have heard in the case against him.

"He has been involved in domestic violence. It has been much more severe than what he has told me about. And the fact that Ms. Carey had a sock in her mouth so I couldn't — so that the kids couldn't hear her yell when he hurt her is not very impressive. But there is — so there are, there are fault issues here and this is significant.

"But there is another problem. Number one, I cannot find, and I will not find whatever my decision in [this] case, that there is not a bond between this child and her father. There is no evidence that there is not a bond, not one scintilla.

"* * * I don't know anything as a matter of fact that would lead me to believe anything other than this man has a significant relationship with his child and clearly has a significant relationship with his older children.

"And I heard very, very impressive evidence that this man has behaved, comported himself in dealing with schools with his older kids in a way that is remarkable. It is very positive. Those are functional, well adjusted children. I have heard nothing, zero to the contrary. It is a tremendous dilemma. I have never seen anything like it."

Ultimately, although the court expressed "grave reservations" about the severity of father's violent behavior and criminal history, it concluded that terminating father's parental rights was not in child's best interests. As for mother, the court found that "[t]he case against her is solid and overwhelming, but a half adoptable child serves no ascertainable purpose."

Child appeals, arguing that the trial court erred in failing to order the termination of the parental rights of both mother and father. SCF filed a brief in support of child's appeal. Father argues that the trial court correctly declined to terminate his parental rights. He also cross-assigns error to the trial court's denial of his motion to dismiss. Mother likewise argues that the trial court properly denied child's petition.

■ Because of its jurisdictional nature, we begin with father's cross-assignment. He argues that the trial court should have granted his motion to dismiss child's petition, because it is not really child's petition. According to father,

ORS 419B.500 provides that only the "state or the child" may file a petition for termination of parental rights. In this case, child's *attorney* filed the petition, and, father argues, the statute says nothing about that. Invoking ORCP 27 A, father contends that only child herself, by her guardian or guardian *ad litem*, may file a petition under ORS 419B.500. Child argues that, in authorizing a "child" to file a petition, it implicitly permits the attorney for the child to do so as well and that the statute says nothing about a child being permitted to appear only by a guardian or guardian *ad litem*. We agree with child.

ORS 419B.500 provides, in part:

"The parental rights of the parents of a child within the jurisdiction of the juvenile court * * * may be terminated * * * only upon a petition filed by the state or the child for the purpose of freeing the child for adoption if the court finds it is in the best interest of the child."

The question in this case is what is meant by the statutory term "child," specifically, whether it means that only the child, as opposed to an attorney acting on behalf of the child, may file such a petition.

ORS 419A.004(2) provides that, for purposes of ORS chapter 419B, "child" means "a person within the jurisdiction of the juvenile court * * *." That does not mean, however, that the term cannot also reasonably mean one who represents or acts on behalf of such a person. The term "party" for example, commonly refers to the party's attorney as well, even though, strictly speaking, the attorney is not the party. Similarly, unless we are to conclude that the legislature contemplated the submission of petitions scrawled in crayon by preschool petitioners, it must be assumed that the term "child" can refer to one who acts on behalf of a child.

■ Indeed, father acknowledges that much. He nevertheless argues that, under ORCP 27 A, the only other person who may act as the child is a guardian or guardian *ad litem*. That argument, however, rests on an assumption that ORCP 27 applies to termination proceedings. Father has cited no authority for that assumption, and we are aware of none. Moreover, the termination statutes themselves cast some doubt on father's argument. ORS 419B.195(1), for example,

provides that either a child or a child's guardian may request the court to appoint counsel to act on his or her behalf. Thus, a child—independent of a guardian—is authorized to seek appointed counsel. Similarly, ORS 419B.115(1) refers to a minor child and a guardian as separate parties in termination proceedings.

All of which is to say that the language of the statute examined in its relevant context does not conclusively provide the answer. We therefore consult the legislative history of the disputed portion of what has been codified as ORS 419B.500.

The legislative history makes the intentions of the legislature readily apparent. Before 1997, the parental termination statute provided that parental rights may be terminated, but said nothing about who may or may not initiate a termination proceeding. Some parents took advantage of the ambiguity and initiated proceedings to terminate their own parental rights, apparently to avoid their child support obligations. To remedy that situation, among many other things, a "Best Interest of the Child Legislative Work Group" drafted an amendment to ORS 419B.500 to specify that only the state or the child may initiate a proceeding to terminate parental rights. Before the Senate Committee on Crime and Corrections, working group member Timothy Travis offered a section-by-section analysis of the bill entitled "Guide to the BIC [Best Interest of the Child]," which explained:

> "At least one parent, in the past two years, has filed a petition to terminate their own rights in an attempt to escape child support obligations in domestic relations case[s]. The purpose of this section is to ensure that the statute is not misused this way.

> "Only the state, *or the child's attorney*, is allowed to file a termination action, for the purpose of effectuating an adoption of the child.

> "*The child's attorney* is added to the statute for the first time to codify the long-time practice in Oregon. Children's attorneys can expedite a termination, cutting the time in foster care and before adoption, because of the backlog of such cases with which [*sic*] the District Attorney (who prosecutes these cases in Multnomah County) and the Attorney

General (who prosecutes them elsewhere in the state). The Juvenile Rights Project, Inc., in Multnomah County also contracts with the State Court Administrator to prosecute terminations in regard to the children they represent."

Senate Committee on Crime and Corrections, SB 689, March 24, 1997, Ex E (emphasis added).

Before the House Committee on the Judiciary, working group member Nancy Miller, who was also Director of the Citizen Review Board Program and the Legislative Liaison to the State Court Administrator on Juvenile Issues, gave a similar explanation. Referring to section 6 of the bill, she stated:

"Section 6. The words in section six were added to deal with situations in which parents were trying to terminate their own rights just to be able to avoid paying child support. So what this section says is that a petition for termination of parental rights can only be filed by the state or the child—*meaning the attorney for the child*—for the purpose of freeing the child for adoption."

Tape recording, House Committee on the Judiciary, SB 689, June 11, 1997, Tape 51, Side B (statement of Nancy Miller) (emphasis added). She also submitted to the committee an exhibit containing an explanation of the working group's proposed amendments, and that exhibit likewise explains:

"It has long been the policy of the courts that parents should not be able to terminate their own rights nor should one parent be able to try to terminate the rights of the other. The state (either the Department of Justice or a district attorney's office) and the child's attorney have been the 2 parties who have traditionally filed the actions. This statute codifies that policy.

"The filing of such actions *by children's attorneys* has become more important over the years, due largely to the number of cases and the inability of the state to keep up with demand, especially in Multnomah County. For the first time, during the last interim, a firm representing children has been awarded a contract by the State Court Administrator to prosecute terminations."

House Committee on the Judiciary, SB 689, June 11, 1997, Ex I ("Senate Bill 689 'The Best Interest of the Child' Updated Section By Section Analysis") (emphasis added).

Clearly, the term "child" was repeatedly and consistently equated with "child's attorney." Indeed, at one point, Miller expressly defined the term "child" as "meaning the child's attorney." We conclude that ORS 419B.500 permitted child's attorney in this case to file the petition for termination of parental rights.

■   We turn, then, to the merits of child's appeal. Child contends that the trial court erred in failing to conclude that there is clear and convincing evidence that both parents are unfit and that it is in child's best interests to terminate their parental rights. According to child, the evidence shows that father is unfit due to a long history of domestic violence, drug abuse, and criminal conduct. As for mother, child argues that, given the trial court's correct conclusion that the evidence against her fitness was "overwhelming," the court should have terminated her parental rights as well. We begin with our evaluation of the evidence as to father.

■   ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"* * * * *

"(3)   Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"* * * * *

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available

social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child."

The record in this case reveals a long history of addictive or habitual use of marijuana, if not also crack cocaine. It likewise reveals that father has been involved in the production and distribution of crack cocaine, sometimes to children. There is also undisputed evidence of a long history of calculated, extreme violence towards each of the mothers of his children. Father disputes little of that. Indeed, he admits that he needs treatment for his violent tendencies and his drug dependency, although he has yet to complete any treatment programs for either problem. His contention on appeal is that none of his drug use, domestic violence, or criminal conduct has been shown to pose a direct danger to child. The law does not require a child to remain in a dangerous environment until the state can show harm to the child, however. *State ex rel Juv. Dept. v. Gohranson*, 143 Or App 36, 42, 923 P2d 1259, *rev den* 324 Or 395 (1996). And on this record, we are persuaded that there is a significant threat of danger to child.

There is evidence that father has used drugs in the presence of his children and that he exposed them to his production of crack cocaine; one of his children, in fact, could explain the production process in detail. He permitted his children to sleep in a drug house, near weapons and bindles containing cocaine residue. Indeed, child ended up in the line of fire as one of father's associates attempted to escape during a police raid. Father kept guns and knives around the house and permitted one of the children to play with a revolver. He whipped some of the children with a belt, as he regularly did the women whom he beat.

The evidence further shows that father's conduct and conditions are not likely to change within a reasonable time. Father admits to having a serious domestic violence problem, but he does not understand how that problem affects his ability to be a good parent to child. He steadfastly, and incredibly, denies his involvement in the production of

crack cocaine. He acknowledges his continued marijuana use, but again, he does not understand how that could affect his ability to care for child. In consequence of that history and of the persistent denial, Kitch testified that father's prognosis for providing a home free of domestic violence was poor and that he had serious concerns about placing child in father's custody.

We are persuaded that it is in the best interests of child to terminate father's parental rights. Father's long history of domestic violence, drug abuse, and criminal activity, as well as his apparent disinclination to change, suggest strongly that he will not be able to provide a safe and stable home for child. We acknowledge that father has made substantial efforts to participate in the lives of his children. It is clear that father cares for all of them and that he has developed a bond with child during the relatively limited and structured time that he has spent with her. But we cannot turn a blind eye to the other facts of father's life and the extent to which his behavior poses a danger to child. This is, as the trial court correctly observed, a difficult case. We nevertheless conclude, after carefully reviewing the record before us, that the trial court erred in failing to terminate father's parental rights.

■      As for mother, the trial court concluded that the evidence against her was overwhelming, and we agree. The only reason the trial court did not terminate her parental rights was that it had declined to terminate father's rights. Having determined that father's parental rights should be terminated, we conclude that there is no longer any impediment to terminating mother's rights as well.

Reversed and remanded for entry of an order terminating both mother's and father's parental rights.