Submitted March 5, judgment terminating parental rights of X. Z. F. reversed, otherwise affirmed May 13, petition for review denied August 20, 2015

(357 Or 640)

In the Matter of R. D. K., Jr.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

R. K., Sr.,
*Appellant.*

Marion County Circuit Court
J140090; A157281 (Control)

In the Matter of X. J. L. B.-M. F.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

X. Z. F.,
*Appellant.*

Marion County Circuit Court
J140092; A157386

In the Matter of R. D. K., Jr.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. J. B.-K.,
aka A. J. B., aka A. B.-M.,
*Appellant.*

Marion County Circuit Court
J140089; A157472

In the Matter of X. J. L. B.-M. F.,
a Child.

DEPARTMENT OF HUMAN SERVICES,

*Petitioner-Respondent,*

*v.*

**A. J. B.-K.,**
aka, A. J. B, aka A. B.-M.,
*Appellant.*

Marion County Circuit Court
J140091; A157474

351 P3d 68

Peter Gartlan, Chief Defender, and Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant R. K., Sr.

Megan L. Jacquot filed the brief for appellant X. Z. F.

Laura S. Anderson and Laura S. Anderson, LLC, filed the brief for appellant A. J. B.-K.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Andrew M. Lavin, Senior Assistant Attorney General, filed the briefs for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

DUNCAN, P. J.

## DUNCAN, P. J.

This is a termination of parental rights case involving two boys, X and R, ages six and two, respectively, at the time of trial, and their three parents: the mother of X and R (mother); the father of X (XZF); and the father of R (RK). The three parents have filed separate appeals from judgments terminating their parental rights based on unfitness by reason of conduct or condition seriously detrimental to the child. ORS 419B.504.[1] The appeals have been consolidated. On *de novo* review, ORS 19.415(3)(a), we conclude that the trial court did not err in terminating the parental rights of mother and RK, but we reverse the judgment as to XZF.

X was born to mother and XZF on October 12, 2007, when mother was 17 years old and XZF was 16 years old. Mother and XZF did not maintain a romantic relationship, but XZF regularly looked after X until XZF was arrested in May 2010 on charges of first-degree robbery and unlawful use of a weapon, arising out of an incident in which he and two others took an ounce of marijuana at gun point. XZF was convicted after a guilty plea and sentenced to a 90-month prison term.

Mother and RK met in high school and married in September 2011. X lived with mother and RK, and R was born in June 2012.

Mother and RK have criminal records. In 2010, RK was convicted of carrying a concealed weapon and theft; in 2011, he was convicted of possession of less than an ounce of marijuana within 1000 feet of a school; and, in 2013, he was convicted of interfering with a police officer and resisting arrest, arising out of a domestic disturbance in December 2012. Mother has a conviction for interfering with a police officer arising out of that same incident. The record shows that, in 2012, RK and mother had no fewer than six contacts

---

[1] ORS 419B.504 provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

with police arising out of domestic violence, under circumstances in which the children were present. During these dependency proceedings, both RK and mother have spent time in jail.

In January 2013, the children, then ages five (X) and six months (R), were removed from mother's and RK's care after police responded to a welfare check call regarding domestic violence and drug abuse, including the presence of drug paraphernalia in the home. At that time, mother was arrested and charged with possession of methamphetamine and two counts of child endangerment, for which she was ultimately convicted. RK was arrested the next day, and he later pleaded guilty to felony fourth-degree assault and received a sentence of probation.

In February 2013, the juvenile court took jurisdiction of the children, and, in June 2014, the juvenile court entered the termination judgments now on appeal. We first address the judgment terminating mother's parental rights to both children. The court terminated mother's parental rights to both boys pursuant to ORS 419B.504, based on the determination that there was clear and convincing evidence of unfitness as a result of mother's criminal conduct, drug and alcohol abuse, exposure of the children to domestic violence, lack of effort or failure to maintain a suitable or stable living situation for the children, emotional or mental illness, and lack of effort to adjust circumstances or conditions to make return of the children possible within a reasonable time.

Mother, who has a long history of drug and alcohol abuse, beginning as a pre-teenager with the use of alcohol, marijuana, and methamphetamine, acknowledges that, at the time of the hearing, she was addicted to methamphetamine, suffered from mental health issues, and was essentially homeless. Mother has been diagnosed with posttraumatic stress disorder, major depressive disorder in partial remission, and narcissistic and anti-social personality traits.

Mother contends on appeal that the Department of Human Services (DHS) has not made sufficient efforts to assist her, and that, with proper assistance, she will be able

to care for the children in a reasonable time. Specifically, she asserts that, with proactive assistance in securing residential drug and alcohol treatment, she will be able to resolve her drug addiction and mental health issues, as well as her homelessness. She requests at least six months to demonstrate her sobriety in treatment. She contends that that amount of time is reasonable in light of evidence that the children are doing well in their current foster placement and have no developmental or behavioral issues that demand immediate placement for adoption.

In order to terminate a parent's rights on the basis of unfitness, a court must find that (1) the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child; (2) integration of the child into the parent's care is improbable within a reasonable time due to conduct or conditions not likely to change; and (3) termination is in the best interests of the child. ORS 419B.500; ORS 419B.504; *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001).

The state must establish the statutory grounds for termination by clear and convincing evidence. ORS 419B.521(1). Evidence is clear and convincing when it makes the existence of a fact "highly probable" or when it is of "extraordinary persuasiveness." *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 79, 106 P3d 627 (2005); *State v. Simon*, 180 Or App 255, 263, 42 P3d 374 (2002).

In addressing the question of "serious detriment," the court focuses on the detrimental effect of the parent's conduct or condition on the child, "not just the seriousness of the parent's conduct or condition in the abstract." *Stillman*, 333 Or at 146. A condition or conduct can be "seriously detrimental" based on the potential for harm. *State ex rel DHS v. Payne*, 192 Or App 470, 483, 86 P3d 87, *rev den*, 337 Or 160 (2004); *Caldwell v. Lucas*, 170 Or App 587, 600, 13 P3d 560 (2000), *rev den*, 332 Or 56 (2001) ("The law does not require a child to remain in a dangerous environment until the state can show harm to the child[.]"). The "serious detriment" inquiry is "child-specific," and calls for testimony regarding the needs of the particular child. *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 657, 126 P3d

710 (2006). Clear and convincing evidence of unfitness must exist at the time of the termination hearing; past unfitness is insufficient. *Id.* at 656. But a child's apparent wellness at the time of trial, after removal from the parent's care, does not preclude a determination of serious detriment. *Dept. of Human Services v. F. J. S.*, 259 Or App 565, 584, 315 P3d 433 (2013), *rev den*, 354 Or 840 (2014).

In reviewing *de novo* a judgment terminating parental rights, an appellate court determines anew whether to terminate a parent's parental rights, giving "considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990). On *de novo* review, we conclude that the trial court did not err in terminating mother's parental rights.

The record demonstrates, and mother does not dispute, that mother is currently unfit because of her mental health issues, her abuse of drugs and alcohol, and her exposure of the children to domestic violence and drug abuse, and that her unfitness is detrimental to the children. The record shows that mother has resisted and not followed through with various services offered by DHS since January 2013. Mother has also failed to follow through with visitation with the children. Mother acknowledges that she is not currently able to parent the children, but contends that, if she is offered residential treatment, she will be able to care for them in approximately six months, which she considers to be a reasonable time.

As noted, in order to terminate parental rights under ORS 419B.504, the court must find that integration of the child into the parent's care is improbable within a reasonable time due to conduct or conditions not likely to change. In evaluating whether integration of a child into the parent's care is improbable within a reasonable time, the court must evaluate "the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.'" *Stillman*, 333 Or at 145-46 (citing ORS 419B.504). The "[r]easonable time" standard is child-specific; it depends on the

needs of the particular child at issue. *See* ORS 419A.004(20) ("'Reasonable time' means a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments.").

In this case, even assuming that a period of approximately six months is a reasonable time for the children to wait, mother's assessment of her ability to care for the children at the conclusion of that time period is not supported by any evidence other than mother's prediction, and we are skeptical of that prediction, in light of mother's history, resistance to treatment, and lack of follow through. We conclude, based on mother's history of drug abuse, domestic violence, and past resistance to help, that it is unlikely that mother's conduct and conditions will change in the foreseeable future. *See State ex rel Dept. of Human Services v. J. S.*, 219 Or App 231, 263, 182 P3d 278 (2008) ("Given mother's long-term and consistent pattern of drug use and denial, together with prolonged unsuccessful efforts on the part of DHS to help mother engage in services * * * it is unlikely that mother's conduct and conditions will change at all, let alone within a reasonable time such that child could be integrated into her home."). We find, further, based on that same history and lack of follow through, that clear and convincing evidence supports the determination that termination of mother's parental rights is in the best interests of the children.

The father of each boy also appeals the judgment terminating his respective parental rights. We first address the arguments raised on appeal by RK, mother's husband and the father of two-year-old R. At the time of trial in June 2014, RK was 22 years of age. As previously noted, R and X were removed from mother's and RK's home in January 2013. RK was convicted of fourth-degree assault and sentenced to probation as a result of the incident that led to removal of the children. He repeatedly violated the conditions of his probation, by consuming alcohol, having contact with mother, and failing to check in with his probation officer, and he received jail sanctions as a result of the probation violations. RK was ordered by the juvenile court to complete domestic violence treatment, but he could not begin that program until he had completed drug and alcohol treatment. Then, on February 6, 2014, RK was arrested and convicted

of operating a stolen vehicle, for which he was sentenced to a term of incarceration with a release date of June 8, 2014, two days before the termination trial.

RK testified at trial and was frank about his past misconduct and his desire to change. He admitted that, in the past, his priorities were "messed up" and his conduct was the result of "stupid choices." As noted, during the pendency of these proceedings, RK violated the conditions of his probation several times, resulting in jail time. When he was not in jail, RK began but did not complete services, because he did not want to expose himself to arrest for probation violations. At of the time of trial, RK had been out of jail for just two days and was on post-prison supervision. At that time, he had been enrolled for three weeks in SOAR, an intensive program including courses related to drug and alcohol abuse, parenting, academic planning, job-seeking skills, and cognitive restructuring geared toward persons who have been incarcerated, and he had completed two weeks of alcohol abuse treatment. He was living in recovery-based housing with the assistance of SOAR, where he could receive R as a visitor. Additionally, SOAR provides subsidies for graduates to obtain housing suitable for children, and RK hoped to find suitable housing through that resource. RK was scheduled to graduate from SOAR on August 15, 2014. He then planned to engage in three months of SOAR "aftercare" and begin domestic violence treatment. RK had a promise of employment, but he had not begun to work. RK was still married to mother at the time of trial and was not certain whether he would divorce her; he thought that their relationship could continue if mother begins to change. But, RK testified that, if he retained his parental rights to R, he would stop seeing mother. RK expressed commitment to maintaining R's relationship with X and a willingness to parent X until XZF is released from prison.

The record shows that R is developing appropriately and has a strong sibling bond with X. R was removed from RK's care at the age of six months. Because of RK's time in jail, he has not had a chance to visit R or build a relationship with him; thus, there is no evidence that R is bonded with RK. In the opinion of Dr. Sage, a psychologist resident at the Children's Program in Portland, at age two, R is in need of

adoption, because he is "starting to * * * age out of the sensitive period for development attachment in the first few years of life." Sage testified that, in order to minimize risks for future attachment and emotional problems, it is in R's best interest to be adopted in the next few months.

The juvenile court commended RK for being honest and open about his past conduct, for taking responsibility for that conduct, and for being willing to change and engaging in SOAR. Nonetheless, the juvenile court terminated RK's parental rights to R, explaining that three weeks of participation in SOAR was not sufficient to establish that RK could successfully parent R. Additionally, the court expressed concern that, despite his testimony, RK would continue to see mother. In view of RK's past conduct and repeated violations of the "no contact" order, the court expressly rejected RK's testimony that he would not see mother if his parental rights were not terminated. The trial court terminated RK's parental rights based on findings that RK was unfit by reason of conduct or conditions not likely to change within a reasonable time.

On appeal, RK contends that the trial court erred in determining that he was unfit at the time of trial and mistakenly placed on him the burden to establish that he would be able to successfully parent, rather than requiring the state to establish that it was "highly probable" that he would engage in conduct detrimental to R in the near future. He contends that the evidence at trial shows that he is now on track and is not engaging in any activity that is detrimental to R.

The state responds that, notwithstanding RK's recent progress, the evidence, including RK's own testimony, is that RK has led a chaotic life that is incompatible with parenting, including abuse of alcohol, domestic abuse, regular criminal behavior, repeated incarceration, and unstable housing. The state points out that, from the time R was removed from the home in January 2013 until RK was incarcerated in February 2014, RK did not change the lifestyle that caused R's removal. At the time of trial, RK had been out of jail for only two days and had participated in alcohol treatment for only two weeks. In the state's view,

those brief and recent efforts to change do not demonstrate an amelioration of the circumstances that resulted in R's removal or show that RK can be sober or crime free outside of a controlled environment. Additionally, at the time of trial, RK did not have housing that could accommodate R and had not begun to address his domestic violence problem. The state also notes that RK's testimony at trial did not demonstrate a commitment to leaving mother, who, the state contends, is a destructive influence in his life. Finally, the state points to evidence that R is in need of permanency now and cannot wait an indeterminate time for father to become fit, because further delay will place him at risk of psychological harm.

We agree with the juvenile court and conclude that the state has demonstrated that, despite RK's recent progress and his testimony concerning his commitment to changing his conduct and lifestyle, as of the date of trial, RK remained unfit, and the conditions causing his unfitness are seriously detrimental to R. Two weeks of successful alcohol treatment while in custody does not overcome the other evidence of unfitness, including RK's history of alcohol abuse, domestic violence, and criminal conduct.

Citing *State ex rel SOSCF v. Armijo*, 151 Or App 666, 950 P2d 357 (1997), a termination case involving a parent's improvement before the termination hearing, RK emphasizes that it is not his burden to show that he can parent, but the state's burden to prove the requisites for termination under ORS 419B.504. It is true, as RK contends, that, in *Armijo*, we said that the state had not shown by clear and convincing evidence that the mother "will not succeed, thus rendering reunification 'improbable.'" 151 Or App at 682 (emphasis omitted). But in *Armijo*, the mother had participated for 10 months in residential programs to address her psychological and substance abuse issues. *Id.* at 673-78. Here, RK has just been released from custody and begun treatment, and he has not addressed the other issues that led to the jurisdictional judgment, including domestic violence and criminal conduct. We conclude that, considered together, all those circumstances make it improbable that R can be returned to RK's care within a reasonable time. *See State ex rel Juv. Dept. v. S. W.*, 231 Or App 311, 329, 218 P3d

558, *rev den*, 347 Or 446 (2009) (where there is no indication of when the parent might be able to safely care for the child, return within a reasonable time is improbable). Finally, we agree with the trial court that, in light of evidence showing that R is at an age where he needs permanency now to avoid psychological damage, termination of RK's parental rights is in R's best interests.

We move on to address the appeal of XZF, the father of six-year-old X. At the time of trial, XZF, then 22 years old, was incarcerated after pleading guilty to first-degree robbery with a firearm (a Measure 11 offense) and unlawful use of a firearm. He began serving his sentence on May 12, 2010, and, at the time of trial, had 36 months remaining, with an anticipated release date of November 11, 2017. There are not many counseling services available to a person imprisoned for a Measure 11 offense. However, while in prison, XZF has completed his GED and has cooperated with DHS. XZF testified that he has family in Salem who will help him when he is discharged. DHS personnel working with XZF did not have any concerns regarding risks of domestic violence or drug or alcohol abuse.

Before his arrest, XZF had a relationship with X and took care of him regularly. XZF thinks that he still has a relationship with X, but he admits that it is not strong, due to limited contact during his incarceration. X's caseworker offered the opinion that XZF had not made an effort to have a relationship with X. For example, DHS recommended that XZF write letters to X, but XZF has written only one; XZF explained that writing to a young child is difficult for him and feels impersonal. XZF has had one telephone conversation with X, which was by all accounts successful. XZF explained that he could not call X more frequently, because currently his wages go to payment of a fine imposed as discipline for fighting shortly after he was imprisoned.

XZF hopes to have weekly visits with X during the remainder of his incarceration. He was originally housed at Eastern Oregon Correctional Institution (EOCI), too far for X to visit, but with good behavior he has recently moved to Mill Creek Correctional Facility in Salem, where he can begin to receive X as a visitor. XZF has completed the

paperwork and obtained the approval necessary to receive X as a visitor at Mill Creek, and, at the time of trial, a visit was scheduled.

Both X and R are currently living in Salem with their second foster placement, a maternal aunt. When X was first placed in foster care, he experienced symptoms of emotional distress, an adjustment disorder, and a depressed mood, but, with counseling, he is now doing well. However, the current foster placement is not an adoptive resource for X or R; DHS has identified an adoptive placement for both boys with a different maternal aunt in Colorado.

The juvenile court terminated XZF's parental rights pursuant to ORS 419B.504. In its ruling from the bench, the court focused primarily on XZF's criminal conduct and the resulting incarceration: (1) XZF's decision to engage in criminal conduct resulting in his incarceration, leading to X's exposure to domestic violence and drug abuse in mother's care and the subsequent need for foster placement; (2) XZF's failure to acknowledge the extent of his involvement in the robbery that led to his conviction and incarceration;[2] (3) XZF's fighting incident at EOCI, for which the trial court found that XZF had not taken full responsibility and which had lengthened XZF's incarceration at EOCI and delayed his ability to have contact with X; and (4) the length of XZF's remaining prison term. The trial court also found

_____

[2] When questioned about the conduct that had resulted in his imprisonment, XZF testified:

"To be honest, I didn't do anything. You know, I take full responsibility for—you know, being around maybe some negative people, and in a bad situation—you know, but it definitely wasn't a robbery. You know, I took a deal for rob one. I was 18 years old in a county jail and didn't really know exactly what was going on, didn't really understand Measure 11. But—you know, I'm not saying I didn't do anything wrong, but I definitely wasn't part of a robbery.

"Q. Did you and your friends take some dope from other people?

"A. I didn't take any dope from anyone, ma'am."

The trial court doubted XZF's testimony that he had had no involvement in the robbery, stating, "The Court is concerned that father has not taken full accountability for those actions, and pleading guilty to a crime that serious that gets you a 90 month sentence makes very little sense to the Court." XZF similarly downplayed the significance of his discipline at EOCI, which resulted in segregation and a fine, explaining that conflicts are hard to avoid. The trial court expressed concern that father had not accepted responsibility for his criminal conduct.

that XZF had not developed a sufficient plan for return of X after his release from prison. Based on those conditions, the juvenile court determined that there was clear and convincing evidence of unfitness seriously detrimental to X. The court further found that, in light of XZF's imprisonment, integration of X into XZF's home was improbable within a reasonable time. The court concluded that adoption was in X's best interests, because it would give X permanency, avoid separating X and R, and avoid the possibility that X would need to move between additional foster families.[3]

On appeal, XZF challenges the juvenile court's determination that his incarceration is a condition that is seriously detrimental to X. He asserts that, although his incarceration means that he is not currently a placement resource for X, he has the desire and ability to rebuild his relationship with X and he wants to be responsible for him upon his release from prison. XZF testified that he has good relationships with both the current foster parent and the prospective adoptive placement, and that they will allow him to have contact with X, with whom a visit is scheduled. XZF acknowledges that his incarceration has prevented him from connecting with X, who was initially too young to visit him at EOCI. But he contends that the evidence at trial shows that he loves the child, that he has made the effort to move to the Mill Creek facility, and that he has a plan for reunification with X upon his release from prison. He further asserts that waiting for XZF to be released from prison will not cause serious detriment to X, who is well-adjusted, happy, and doing well in his foster placement, and

---

[3] The juvenile court explained why it concluded that adoption was in X's best interest and why APPLA, "another planned permanent living arrangement" or permanent foster care, was not:

"The difficulty for [X] is that there is still a long time to wait for you. And the plan of permanent foster care is the only one that would be available. And I can't even look at it to get there. I would first have to consider whether or not the plan should be adoption. And only once I decide the plan shouldn't be adoption could I look at a plan of guardianship, which there is no guardian. *** And then look at another plan of permanent living arrangement for him to remain in permanent foster care. The evidence is *** that [X] is very adoptable, that he's bonded to his brother, that they should not be separated, that he needs permanency now, that at his age he needs to be developing these attachments to primary care givers, that he needs to have certainty with regards to his housing, his schooling, his relationships. And if he doesn't have that, then it could affect his emotional well being."

who should have the opportunity to have a relationship with his father.

XZF recognizes that it is in X's interest to be placed with R and, for that reason, he does not object to X moving to Colorado if R is adopted there. But he asserts that the state has failed to prove that he is unfit or that it is in X's best interests to be adopted. Even if his parental rights are terminated, however, XZF hopes to maintain his relationship with X, and his caseworker and the prospective adoptive placement would support that.

In support of termination, the state relies on the same considerations that led the juvenile court to terminate XZF's parental rights. The state asserts that XZF's incarceration and unavailability were and are seriously detrimental to X because they caused X to be exposed to domestic violence and drug abuse in mother's and RK's home and resulted in successive foster placements, causing X to suffer emotional distress, a psychological disorder, and behavior problems. Although those circumstances existed at the time DHS became involved, we agree with father that the relevant inquiry for purposes of termination is whether the parent's conduct was seriously detrimental to the child at the time of the trial. *Stillman*, 333 Or at 148-49. At the time of trial, X was not living with mother and RK, was no longer experiencing emotional distress, and was well adjusted. Additionally, counselors planning to move X from his current foster placement to Colorado did not think that it would be a difficult transition for X.

The state asserts, nonetheless, that XZF's continued incarceration and inability to care for X place X at further risk of harm from changing foster placements and a lack of permanency. There was no psychological assessment of X but, at trial, the DHS witness explained why DHS would not recommend additional foster care for X until XZF's release from prison:

"Well, children that are young need to be forming attachments. They need to know who their primary care giver is. They need to know that they are going to have stable housing. Being in a possibly transient situation for a long time can affect them emotionally, affect their attachment.

In addition, legally [to change to permanent foster care] we have to prove that a child is not adoptable, that it is in best interest not to be adopted. And at this point we don't have any evidence that that would be true."

XZF responds that, under *Stillman*, incarceration is not a serious detriment *per se*, nor is a child's normal anxiety about his future, caused by the parent's incarceration and the termination proceeding. 333 Or at 152. But, as the state notes, the court also said in *Stillman* that incarceration and its consequences for children are within the "purview of the court," *id.* at 147-48, and a prolonged incarceration "could be a condition so 'seriously detrimental to the child' as to warrant a finding of unfitness[,]" *id.* at 148.

In *Stillman*, the court considered whether the father's unavailability to parent for up to one year after the trial, including the remaining four months of incarceration plus post-prison time in a halfway house, was seriously detrimental to his children. *Id.* at 142, 149. The only evidence of "detriment" related to the "children's worry about their parent's well-being and the uncertainty surrounding the termination proceeding itself." *Id.* at 150. The court concluded in *Stillman* that the level of anxiety that the children experienced was typical under the circumstances and was not the "sort of serious detriment that the legislature contemplated as providing the basis for a conclusion that a parent is unfit,"[4] noting that "'[t]he reason for terminating parental rights ought to be related to the parent's conduct as a parent.'" *Id.* at 152 (quoting *Simons et ux v. Smith*, 229 Or 277, 280, 366 P2d 875 (1961)). Although the father in *Stillman* was unavailable to parent for many months, the court concluded that the termination of his rights was unwarranted in light of the fact that the children were relatively happy and well-adjusted, any anxiety they were feeling was not the sort of serious detriment that provided a

---

[4] In *Stillman*, the court said:

"It does not strike us as extraordinary that children involved in a termination proceeding would experience anxiety about their future. However, * * * we do not think that the level of anxiety that the children have experienced here is the sort of serious detriment that the legislature contemplated as providing the basis for a conclusion that a parent is unfit."

*Id.* at 152.

basis for terminating parental rights, and the father had a strong extended family and a strong relationship with the children. *Id.* at 150-52. The court noted in *Stillman* that the record contained "no psychological reports or evaluations of the children's mental or emotional health; neither does it contain *any* evidence shedding light on the effect of father's conduct or condition *as a parent* on the children." *Id.* at 150 n 10 (emphases in original).

We recently applied *Stillman* in a case similar to this one, *Dept. of Human Services v. C. M. P.*, 244 Or App 221, 260 P3d 654, *rev den*, 351 Or 254 (2011). There, the mother was incarcerated for killing the children's father during a domestic dispute. The children were ages two and four at the time of the termination trial and had been removed from the mother's care at birth and age 14 months, respectively. *C. M. P.*, 244 Or App at 225-26, 229. The mother and children were not bonded, and the mother had 34 months of incarceration remaining. *Id.* at 233. The evidence relating to detriment was similar to that presented here. One of the children had suffered from behavioral issues "outside the norm" for her age when she was moved from the first foster placement to the grandmother's home and had been diagnosed with an adjustment disorder. Similar to here, there was general testimony in *C. M. P.* that the first five years of a child's life are the "primary attachment years" and that moving the children to another primary caregiver could cause emotional and attachment problems. *Id.* at 236.

We concluded in *C. M. P.* that the state had not presented clear and convincing evidence of serious detriment. *Id.* at 236-37. We explained:

> "[D]ifficulty adjusting to a placement move is not extraordinary in the juvenile system—or, indeed, for many other children (including those whose parents are engaged in military service abroad). Moreover, here, the most recent placement move was not the result of mother's conduct but rather of DHS's decision to move the children from a placement that was, by all accounts, stable."

*Id.*

Similarly, here, the type of detriment X experienced after his removal from mother's and R's home is not the type

of serious detriment that provides a basis for terminating parental rights. Additionally, generalized testimony that a lack of permanency could result in emotional distress does not persuade us that X is experiencing serious detriment as a result of continuing in foster care. If X were able to remain in his current foster placement with R in Salem, he could begin to rebuild a relationship with XZF. Through no fault of XZF, the Salem placement is ending, and X and R are moving to Colorado. Although the maternal aunt in Colorado is open to XZF having contact with X, it cannot be disputed that a move to Colorado will impair XZF's ability to develop his relationship with X. But, as in *C. M. P.*, we cannot conclude that that circumstance is a serious detriment to X, so as to render XZF unfit. *Id.* at 237. Additionally, there is no evidence of unfitness based on XZF's conduct as a parent. *See Stillman*, 333 Or at 150 n 10.

In light of our conclusion that the evidence of XZF's unfitness is insufficient, we do not consider the state's arguments in support of its contention that it met its burden to show by clear and convincing evidence that integration of X into XZF's home within a reasonable time was improbable.[5]

Judgment terminating parental rights of X. Z. F. reversed; otherwise affirmed.

---

[5] The state asserts that, assuming XZF is released from prison in 2017, it is unclear whether or when after that time XZF will become a fit parent, because his plans are vague. Additionally, the state contends that XZF's failure to acknowledge his involvement in the acts that led to his convictions makes it likely that he will reoffend when he is released.