Argued and submitted May 6, affirmed August 14, 2013

In the Matter of K.-M. R.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. L. H.,
*Appellant.*

Marion County Circuit Court
J100681;
Petition Number 102910KAL1;
A152931

308 P3d 323

Holly E. Telerant, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

The question in this termination of parental rights appeal is whether the record establishes, beyond a reasonable doubt, that mother's parental rights to her two-year-old son KM should be terminated for unfitness by reason of conduct and conditions seriously detrimental to KM that would not be resolved within a reasonable time.[1] ORS 419B.504.[2] KM is currently placed for adoption with a relative who has already adopted KM's siblings. KM is a member of the Alaska Native Village of St. Michael, and this case is therefore subject to the Indian Child Welfare Act (ICWA), 25 USC § 1901. In such cases, the factual bases for terminating parental rights must be established beyond a reasonable doubt. ORS 419B.521(4).[3] On *de novo* review, ORS 19.415(2), we affirm.

---

[1] Father's parental rights were separately terminated in a trial before mother's.

[2] ORS 419B.504 provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child or ward.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."

[3] ORS 419B.521(4) provides:

"[I]f an Indian child is involved, termination of parental rights must be supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that continued custody of the child is likely to result in serious emotional or physical harm to the child."

Mother, who was 22 years old at the time of the termination trial, moved out of her parents' family home at age 14 and moved in with father. At that time, she began smoking marijuana on a daily basis, and she also began dealing in the drug. At ages 16 and 17, she had her two daughters who have already been adopted by a relative. During and between her pregnancies, mother used prescription medications for back pain and also abused narcotics. She has been diagnosed with depression and anxiety.

Mother described father as having a violent temper, threatening throughout their relationship to harm her. She first came into contact with DHS in 2008, when, based on domestic violence and drug use, DHS removed the two daughters from the home. Mother, who at that time was essentially homeless, voluntarily relinquished her parental rights to the two daughters in 2009, agreeing that she was not stable enough to take care of them.

KM, who was 23 months at the time of trial, was placed in custody at his birth on October 27, 2010, and has been in DHS custody since that time. He was removed from mother's custody at birth because he tested positive for marijuana and, one month later, mother admitted two allegations of the jurisdictional petition:

"A.   The conditions and circumstances of the child are such as to endanger the child by reason of the following facts: The child's mother has a chemical abuse problem involving controlled substances, including marijuana and prescription drugs, that left untreated disrupts her ability and availability to adequately and appropriately parent, compromises her mental health, endangers her liberty and sobriety to appropriately parent, and makes her a danger to the child.

"B.   The conditions and circumstances are such as to endanger the welfare of the child by reason of the following facts: The child's mother has mental health difficulties that left untreated compromise her ability to adequately and appropriately parent."

Mother has a history of unhealthy relationships with men. As noted, she moved in with father at the age of 14 and had her two older children at 16 and 17. In the

2008 dependency proceeding involving the two girls, mother agreed not to have contact with father. She then briefly separated from him, but they reunited after she relinquished her parental rights to the girls. Shortly thereafter, she became pregnant with KM. After KM was born, mother continued to have contact with father throughout his incarceration for coercion and felony assault charges. While father was in prison, mother expressed intense fear of him to her counselor. But when father was released from prison in January 2012, mother violated her in-home safety plan by allowing father to visit her. Throughout this period, mother consistently told her service providers that she was no longer seeing father; at trial, she admitted that those assurances were lies because she continued to have contact with him. She testified at trial that she is not in love with him, but will always love him because he is the father of her children. She denies that her relationship with father is romantic or that she wishes to reunite with him.

While father was in prison, mother began a relationship with, and married, Zach Sarbu in September 2011. She temporarily separated from Sarbu in August 2012, when she learned that he was abusing prescription drugs and forging prescriptions, and she told DHS personnel that she had discontinued her relationship with him. However, those assurances were, like the ones regarding father, untrue; shortly before trial, Sarbu had been staying at mother's apartment.

In December 2010, shortly after the court assumed jurisdiction over KM, mother was evaluated by Stoltzfus, a clinical psychologist, who administered personality and intelligence tests. In a report of January 2011, Stoltzfus diagnosed mother with post-traumatic stress disorder (PTSD), a depressive disorder, cannabis and opiate abuse, and a narcissistic personality disorder. He reported that mother does not manage stress well, is easily overwhelmed, and has significant difficulty following through with commitments or intentions. Although Stoltzfus found mother to be highly motivated to participate in services at the time of the evaluation, he gave her a poor prognosis, "due to unstable social relationships, extremely self-centered orientation,

tendency to externalize blame and ongoing significant mood dysregulation (anxiety and depression, both of which are chronic)." Stoltzfus testified at trial that mother's dishonesty about her relationships was indicative of her personality disorder and that, based on the circumstances that had transpired since he had examined her in December 2010, he did not expect mother to be able to parent KM within a reasonable period of time.

As noted, the two key areas of concern at the time of the jurisdictional petition were mother's abuse of prescription drugs and marijuana, and mother's mental and emotional health. We find that DHS made active efforts to address those issues in order to reunite KM and mother, that mother has been offered many services and service providers, and that mother's participation has not been consistent or reliable. Beginning in February 2011, mother participated in a drug treatment program at Bridgeway Recovery Services, which provided medication management and service coordination. At Bridgeway, mother attended individual and group therapy sessions. Bridgeway did not provide urinalyses (UAs), and relied on mother's self-reports to verify her sobriety. Kelly Washam, mother's counselor at Bridgeway, testified that, in his opinion, mother lacked the ability to look at situations realistically, had a tendency to minimize, and had an "immature style of problem solving that's very much related to magical thinking." Washam noted that mother has a very limited support system.

Jennifer Laib, a DHS Indian child welfare caseworker, began working with mother in August 2011 and presented mother with an action agreement that required, among other things, that mother maintain contact with DHS, participate in mental health and drug and alcohol treatment, submit to random UAs, and attend visits with KM. Laib testified that, when she took over the case, mother had not been consistent in attending services and was not making much progress. Laib emphasized to mother that she would need to be consistent with services and call to reschedule if she was not able to attend a meeting or appointment. At about that same time, in September 2011, mother married Sarbu. Laib then began to arrange services for Sarbu, including a psychological evaluation, UAs, and bus passes.

Laib testified that, in the first few months of working with mother, she made progress, and the agency made plans for reunification. To help mother build a support system, Laib referred mother to a program called "Fostering Attachment Treatment Court" (FATC), and mother was selected to participate in the program. FATC is similar to a drug court, but also provides services to children. Through FATC, services are coordinated with several providers and include drug and alcohol treatment as well as parenting classes. The court places responsibilities on the parent for attending services, monitors the parent's FATC progress, provides reinforcement through weekly hearings, and imposes sanctions for missed appointments or obligations. A person's progress at FATC is tracked weekly, and weeks are evaluated as either "green" or "red." A green week indicates that the participant has accomplished the goals for that week. A red week indicates that the person has not followed through with required services. When a participant has a red week, a sanction such as three hours of community service is imposed. After accumulating five red weeks, the participant is required to meet with the FATC team to develop a "Contract for Success." If the participant does not follow through with the contract, the participant is dropped from the program.

Mother's services at FATC were coordinated by Laib, mother's Indian Child Welfare Act caseworker, and Shannon Tavernier, mother's permanency caseworker. Tavernier testified that mother began to accumulate red weeks shortly after she began the program, beginning with the week of January 4. By April 4, mother had accumulated five red weeks for conduct that included having contact with father, not appearing for appointments or a UA, not attending one AA/NA meeting per week, failing to appear in court, and failing to attend drug and alcohol treatment and parenting class.

When she began FATC, mother's drug treatment shifted from Bridgeway to Intensive Treatment and Recovery Services (ITRS), and mother worked with Jamie Ream, a certified drug and alcohol counselor. Ream met with mother in March 2012 and developed an individualized treatment plan. However, Ream met individually with mother only

one other time, in July 2012, because mother missed several other scheduled appointments. Due to mother's irregular attendance, Ream was unable to determine whether mother was clean and sober. Based on Ream's assessment and observations of mother, she placed mother at a "Level 1" addiction and mental health dimension, the lowest level of care under the DSM-IV. However, as of the date of trial, mother had yet to complete 60 consistent days of treatment with complete follow-through. Based on mother's lack of follow-through, Ream testified that she would have recommended mother's termination from the program. Ream testified that, although she was concerned about mother's lack of attendance, mother's mental health appeared to be a bigger concern than her drug and alcohol problems.

Father was released from prison in January 2012, and counselors began to receive reports that he was in contact with mother. Mother denied the reports, but, as she later admitted, she was in fact in contact with him. Mother was then terminated from FATC because of the service providers' inability to trust her due to her deception concerning her ongoing relationship with father and her lack of consistency and follow through.

Jimmy Thomas works for Marion County Behavioral Health as a counselor. He was part of mother's FATC service team and had the opportunity to work with mother in a parenting skills program called Circle of Security. Thomas testified that mother grasped the materials well but was not consistent about coming to appointments. She completed the eight-week program in six months.

At a permanency hearing on June 1, 2012, the juvenile court changed the permanency plan from reunification to adoption, but told mother not to give up hope and to stay in services so that she could be reunified with KM. After that hearing, mother missed a treatment appointment on June 4, 2012, without excuse. In August 2012, shortly before trial, mother was arrested for shoplifting with Sarbu.

It would appear from the record, however, that, despite mother's lackluster participation in services, the drug-use issues have been largely ameliorated, and that mother's

depression, anxiety, and chronic pain are now under control. Additionally, at the time of trial, mother's housing situation had greatly improved—she had stable, publicly provided housing and was receiving financial assistance and food stamps.

Despite a relatively low level of concern over drug abuse and housing, DHS decided to pursue termination of mother's parental rights, based on unfitness, ORS 419B.504,[4] and filed a petition on June 7, 2012, to terminate mother's parental rights. The petition alleged that termination was necessary on the grounds that mother is unfit by reason of conduct or condition seriously detrimental to KM, and that integration of KM into mother's home is improbable within a reasonable time due to conduct not likely to change, including, but not limited to the following:

"a)   Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"b)   Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.

"c)   Failure to present a viable plan for the return of the child to the parent's care and custody.

"d)   An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"e)   Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible.

"f)   Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration that it appears reasonable that no lasting adjustment can be effected.

---

[4]  ORS 419B.504 provides, in part:

"The rights of a parent or parents may be terminated as proved in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

"Pursuant to the Indian Child Welfare Act the child is an Indian Child. Active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break up of the Indian family and these efforts have proved unsuccessful. Continued custody of the child by the mother is likely to result in serious emotional or physical damage to the child.

"It is in the child's best interests to be freed for adoption and be provided with the security of a permanent home."

After a two-day trial, during which the juvenile court heard testimony from the tribe's expert witness strongly supporting termination of mother's parental rights and the adoptive placement, and testimony from service providers, the trial court agreed with DHS that termination was appropriate. In terminating mother's parental rights, the trial court focused on mother's untrustworthiness and lack of participation with services, but it is clear that the court attributed those circumstances to mother's emotional and mental illness—depression, anxiety, and a narcissistic personality disorder. Essentially, the court concluded that DHS had established beyond a reasonable doubt that mother's emotional and mental illness, as manifested in self-centeredness and a lack of commitment to the process of regaining custody, meant that mother could not safely care for KM.

To meet its burden to prove that mother is unfit, DHS was required to prove, beyond a reasonable doubt, that mother is unfit, by reason of conduct or condition seriously detrimental to KM, and that integration of KM into mother's home is improbable within a reasonable time due to conduct or conditions not likely to change. ORS 419B.504. In reviewing the record *de novo* to determine the facts material to the case, this court gives considerable weight to the findings of the court, who had the opportunity to observe the witnesses and their demeanor in evaluating their testimony. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990). In this case, the court observed, "I think the first thing I'd point out in regards to [mother] is that she is a habitual liar. I mean, she got on the stand and lied to me just a few minutes ago. She can't tell the truth." Based on our *de novo* review, we agree.

On appeal, mother asserts that we should base our determination on the allegations of the termination petition and should conclude that the DHS failed to prove beyond a reasonable doubt that any of the grounds alleged in the termination petition persisted at the time of trial such that they were likely to result in serious detriment or serious emotional or physical damage to the child. Mother asserts that an examination of the record shows that she has ameliorated all of the circumstances that formed the bases for the termination petition and, further, that it is not in KM's best interests to terminate her parental rights.

Mother asserts, additionally, that the juvenile court erred to the extent that it based its ruling on factual circumstances not alleged in the termination petition, including mother's poor choice of partners, her failure to obtain employment, or her financial dependence. Relying on this court's opinions in *Dept. of Human Services v. N. T.*, 247 Or App 706, 715-16, 271 P3d 143 (2012) (at the permanency stage of a dependency proceeding, the juvenile court may not rely on facts extrinsic to the adjudicated bases for jurisdiction in assessing a parent's progress toward reunification), and *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 266 P3d 107 (2011) (same), mother contends that due process requires that a termination judgment on the ground of unfitness be based only on the circumstances and conditions alleged in the termination petition, and that the facts on which the juvenile court based its determination were not alleged in either the jurisdictional or termination petitions. Thus, mother asserts, she did not have constitutionally adequate notice of the claims against her, and the court erred in relying on those bases as a matter of law. DHS asserts that, properly understood, the juvenile court did not rely on bases outside of the petition, but rather focused on mother's continued mental health condition as the primary reason for the termination.

We agree with DHS that the juvenile court did not commit error in relying on facts outside of the termination petition as bases for termination. Although in its discussion on the record the juvenile court cited circumstances that were not specifically alleged in the termination petition, in particular mother's untruthfulness and lack of effort, it is

clear that the juvenile court attributed those circumstances to mother's mental health, which is one of the bases alleged for termination and was also a basis for the juvenile court's jurisdiction. Thus, we reject mother's contention that the juvenile court improperly relied on grounds extrinsic to the termination petition. In any event, because our review is *de novo*, and we rely on facts regarding mother's poor choice of partners, employment history, and financial dependence only to the extent that they directly relate to the termination petition allegations, the juvenile court's rationale is not relevant.

The remaining question is whether DHS has met its burden to show, beyond a reasonable doubt, that mother is unfit by reason of a condition that renders her unable to safely care for KM, and that it is improbable that KM can be integrated in mother's home within a reasonable period of time, because that condition is unlikely to change. ORS 419B.504.

Mother acknowledges that she has not been as dedicated to or as engaged in services as she could have been, that she has lied to DHS about her continued contact with father, and that she has not ended her relationship with Sarbu, contrary to what she told DHS. She contends, however, that none of those circumstances is seriously detrimental to KM or makes it improbable that KM can be reunited with her within a reasonable time. Further, she asserts that her general circumstances, including stable housing, sobriety, and control of her mental and emotional health, do not support a finding of "serious detriment" and do not support termination. Mother asserts that evidence offered by DHS of the abstract detriment resulting from multiple foster placements is not sufficient for termination. *See Dept. of Human Services v. A. M. C.*, 245 Or App 81, 89, 260 P3d 821 (2011) ("Unspecified detriment that we can only discern because the evidence of conduct or condition 'speaks for itself' is a far cry from actual, clear, and convincing evidence that proves serious detriment.") And, because KM is currently in a potential adoptive placement, mother contends that there is reasonable doubt that a further delay in permanency would be seriously detrimental to KM. Finally, mother asserts that the strong bond between mother and KM, mother's fitness to

parent, and the support that mother has from her extended family require the conclusion that termination is not in KM's best interest.

We conclude on *de novo* review that mother's parental rights should be terminated. It is not necessary to recite the entire record that supports this conclusion. As the trial court and DHS have said, mother is not a bad person. But, like the juvenile court, we find on this record that, beyond a reasonable doubt, mother's long-time emotional and mental condition, as described by Stoltzfus in 2010 and as manifested through mother's recurrent lack of effort over a period of at least several years to commit to an adjustment of her life circumstances through participation in services, and her continued inability to engage in healthy relationships or disassociate herself from father and the other unsafe men in her life, make her unable to safely parent KM, and lead us to conclude that it is improbable that she will be able to do so within a reasonable time.[5]

We further conclude that the termination of mother's parental rights is in the best interests of KM, who has spent two years in foster care, and is currently living with his siblings in an Indian family foster placement that is also the planned adoptive resource. ORS 419B.500; *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 95, 149 P3d 1124 (2006). It is true, as mother asserts, that there is no evidence that KM has experienced significant ill effects as a result of his lifetime in foster care. And, because he came into foster care at birth, there is no evidence as to the effect of mother's condition on KM. Nonetheless, the evidence in this record shows that reuniting KM with mother would not be in his best interest and would be seriously detrimental to his physical and emotional health. In reaching this conclusion, we find particularly persuasive the testimony of Danitra Oxereok, tribal family coordinator, recognized by the court as a tribal expert. Oxereok testified that she had reviewed DHS's records and that, in her opinion, DHS had done everything possible to try to reunite mother and KM.

---

[5] For the record, we also conclude that the state did not prove the following allegations: (a) (regarding alcohol or drug use); (b) (regarding suitable or stable living conditions); or (c) (regarding failure to present a viable plan for the child's return).

In Oxereok's opinion, because of mother's long-term instability, KM would suffer serious emotional and physical harm if placed with mother. Based on our own evaluation of the record, we are persuaded by that assessment.

Having reviewed the record *de novo*, we find beyond a reasonable doubt that mother's mental and emotional condition is seriously detrimental to KM and will not be resolved within a reasonable time and, further, that termination is in KM's best interest.

Affirmed.