In the Matter of A. R. L. N.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Appellant,*
*and*

A. R. L. N.,
*Appellant,*

*v.*

E. N.,
*Respondent.*

Jackson County Circuit Court
14JU00085; A157913

359 P3d 381

Ginger Fitch argued the cause and filed the brief for appellant A. R. L. N.

Cecil A. Reniche-Smith, Senior Assistant Attorney General, argued the cause for appellant Department of Human Services. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Holly Telerant, Deputy Public Defender, argued the cause for respondent. With her on the brief was Shannon Storey,

Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

In this termination of parental rights case, the juvenile court denied the Department of Human Services's (DHS) petition to terminate mother's parental rights to A, who was five and one-half years old at the time of the termination hearing. Both DHS and A appeal the resulting judgment, arguing that mother's rights should be terminated because she is "unfit by reason of conduct or condition seriously detrimental to [A]," ORS 419B.504, and termination is in A's best interests, ORS 419B.500. On *de novo* review, ORS 19.415(3)(a), we agree with DHS and A; accordingly, we reverse.

To terminate mother's parental rights, the state must prove the statutory grounds for termination by clear and convincing evidence. ORS 419B.521(1). Evidence is clear and convincing if it makes the existence of a fact "highly probable" or if it is of "extraordinary persuasiveness." *State ex rel Dept. of Human Services v. Hinds*, 191 Or App 78, 84, 81 P3d 99 (2003). With that standard in mind, we summarize the pertinent facts as we find them below.[1]

## I. FACTS

A. *Mother's circumstances prior to A's removal by DHS in 2010*

A was born on September 27, 2008, when mother was 23 years old. A's father largely has not been part of A's life, and was not a party to the proceedings below. Except for a few brief periods, mother has lived with her own mother

---

[1] Although we ordinarily give "considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony," *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990), "we give little weight to a credibility finding that turns on other factors, such as internal consistency, logic, and corroboration," *State ex rel Dept. of Human Services v. D. F. W.*, 225 Or App 220, 223 n 1, 201 P3d 226 (2009). Here, the juvenile court did not make any demeanor-based credibility findings. The court did find a disputed fact in mother's favor based on corroboration by grandmother, on which mother places emphasis in arguing for deference to the juvenile court. However, the juvenile court did not find mother credible in general, and did not place any importance on the disputed factual finding it made in her favor. Accordingly, we give little weight to the juvenile court's findings.

(grandmother) since becoming pregnant with A. Mother has been unemployed during that time.

Prior to A's birth, mother had several problems related to substance abuse, mental health problems, impulsive conduct, and assaultive behavior. When mother was a teenager, she was diagnosed with attention deficit hyperactivity disorder (ADHD), and, at age 14, she lived in a girls' home for two years because of fighting, including assaulting grandmother. Mother began using marijuana frequently at the age of 18 and began using methamphetamine at the age of 21. Mother admitted to a suicide attempt when she was 18, and records show that mother attempted suicide again when she was 21. After her second suicide attempt, mother was provisionally diagnosed with adjustment disorder with depression and anxiety, marijuana abuse, polysubstance abuse (rule out), and a personality disorder not otherwise specified (NOS).

Mother continued to use methamphetamine, and in October 2007, was admitted to the emergency room for an overdose. Mother also assaulted grandmother that night, which resulted in her conviction for assault and a 21-day jail term. After her release, mother returned to living with grandmother. Mother became pregnant with A about two months later, but did not seek any prenatal care until she was 32 weeks into her pregnancy. Mother did not use methamphetamine while she was pregnant with A, but continued to frequently smoke marijuana, despite being warned of its dangers to her fetus. In March 2008, while pregnant, mother was involved in another assault against a friend's boyfriend perpetrated by mother and A's father, resulting in another assault conviction.

DHS first contacted mother regarding A at the hospital when mother tested positive for marijuana after A's birth. DHS contacted mother based on its prior history with mother's family and awareness of the circumstances of mother's 2007 assault conviction against grandmother. Mother admitted to her marijuana use, but assured DHS that she had not used methamphetamine since October 2007. Mother was cooperative, and A was born healthy, so DHS determined that its concerns were unfounded at that

time. Mother was referred for services to Healthy Family Support Systems, which is an agency focused on preventing child neglect.

DHS's second contact with mother occurred in April 2009, when mother's family support worker from Healthy Family Support Systems contacted DHS to report that A was not gaining weight and that mother was not taking A to the doctor. DHS had mother sign a contract that she would follow up and take A to a doctor. Mother, however, did not do so. The first time mother took A to see a doctor was when A was about nine months old, because A had cut herself on a piece of glass.

Mother's family support worker had additional concerns about A's safety because of mother's continued marijuana use, her leaving A unattended on the couch, resulting in A rolling off of the couch on at least three occasions when she was an infant, and an unusual "giant scab" observed on A's leg that looked like the scabs sometimes seen on mother. Beginning around May 2010, mother presented as particularly stressed, scattered, and distracted, and, in September, her family support worker lost contact with mother.

B. *Mother's circumstances and engagement in services from November 2010 to December 2013*

DHS removed A from mother's care on November 10, 2010, when A was two years old, after receiving a report that mother was using methamphetamine in A's presence. Mother was erratic and hard to track during a conversation; she also had "pick marks" on her skin. She eventually admitted to using methamphetamine two days earlier. At some point during her treatment, mother admitted that her methamphetamine use had begun again when A was seven months old. DHS offered mother services, which she refused, resulting in A being removed that day and placed in non-relative foster care. DHS then filed a dependency petition to make A a ward of the court, alleging that mother's substance abuse and mental health problems interfered with her ability to care for A.

On November 15, 2010, mother entered into a treatment plan for marijuana dependence and methamphetamine

abuse with OnTrack, which offers addiction recovery services, and lived in OnTrack crisis housing. Throughout her treatment with OnTrack, mother was assessed a high risk for relapse, and she exhibited little insight about her drug use. At the end of December 2010, A was returned to mother's care, subject to an action agreement that, among other things, required mother to continue to engage in substance abuse treatment and obtain mental health services. While mother was still at OnTrack, the juvenile court took jurisdiction of A based on mother's admission that her substance abuse problems interfered with her ability to care for A, but dismissed the allegation regarding mother's mental health, subject to mother's agreement to engage in mental health services.

Mother continued living in OnTrack housing until March 2011, when she relocated to Hope House. She was asked to leave Hope House a month later after she was caught trying to falsify a urinalysis (UA) by using A's urine from her potty chair and, subsequently, admitted to recent marijuana use at grandmother's house. Mother and A then moved back to grandmother's house. DHS again removed A from mother's care in May 2011, after mother tested positive for both marijuana and methamphetamine. Except for a one-month placement with her aunt, A has remained in nonrelative foster care since May 2011, with supervised visits with mother.

Immediately upon A's removal, mother stopped her substance abuse treatment and continued to use marijuana and methamphetamine for the next year, despite re-engaging in some drug treatment at Kolpia Counseling Services in October.[2] Mother also failed to follow through with any mental health services after obtaining an initial assessment from Jackson County Mental Health (JCMH).

In June 2011, mother obtained a comprehensive psychological evaluation from Dr. Morrell, on a referral from DHS. Mother was inconsistent in reporting her history, and Morrell noted that her scattered thoughts made her unreliable. Morrell diagnosed mother with, among other things,

[2] Mother gave birth to a second child during this period, who tested positive for methamphetamine. Mother arranged for a private adoption of the child.

ADHD-hyperactive/impulsive, cannabis dependence, methamphetamine abuse, anxiety disorder NOS, mixed personality disorder, and borderline personality disorder (rule out). Mother was also destabilized and prone to casual alignment with males for comfort. Morrell recommended services for mother to enable reunification with A, including alcohol and drug treatment, individual therapy with an assessment for dialectical behavior treatment (DBT), parenting training, vocational assistance, and medication for her ADHD.

Beginning in March 2012, mother started in day treatment at Addictions Recovery Center (ARC), but missed three weeks of treatment. In May, mother entered residential treatment at ARC and tested positive for both marijuana and methamphetamine at intake. All of mother's subsequent UAs were clean; the last was taken June 4, 2012, just before her graduation from the residential program. During her residential treatment, mother specifically requested a prescription for Adderall for ADHD from her primary care doctor. She did not inform her doctor about her methamphetamine use or that she was in treatment for it. Her doctor would not prescribe Adderall because it is an amphetamine and he was uncomfortable that mother had specifically asked for it.

After completing residential treatment at ARC, mother started day treatment, but soon missed a month of appointments. After ARC notified mother that they were closing her case, she returned and graduated from day treatment in October 2012. At graduation, her counselor recommended that she continue with outpatient treatment. However, despite agreeing to, mother has not engaged in any further substance abuse treatment, having stated that it would be "redundant" and that "it does not work for her."

While she was still in day treatment, in July 2012, DHS referred mother to Morrell for a second comprehensive psychological evaluation. Mother completed the testing portion of the evaluation, but failed to attend the interview. Although the evaluation was incomplete without the interview, Morrell noted that mother's composite data suggested that mother "will remain a personality-disordered, hedonistic, egocentric individual" and that "[t]here is nothing in the

available evidence to marshal much of an argument in support of her as a steady, empathic, child-centered parent." He also noted that mother's "start/stop" engagement with treatment was consistent with her personality profile, and "has delayed reunification with [A] in a way that will invariably be harmful to [A]."

Mother did not engage in any further services until February 2013, when she sporadically attended individual mental health counseling at JCMH. She also failed to attend appointments she made at Phoenix Counseling Center. Mother made no progress at JCMH, and her case was closed at the end of May due to her missed appointments.

In May 2013, DHS filed a new dependency petition for A, alleging that mother's mental health problems interfered with her ability to safely parent A, and the juvenile court took jurisdiction of A on that basis in July after mother failed to appear for the hearing. The juvenile court then consolidated that case with the prior case in which the court had taken jurisdiction of A based on mother's substance abuse.

In June 2013, mother again requested Adderall by name from her primary care doctor and "aggressively" declined a nonstimulant ADHD medication. Her doctor was concerned about mother's request and, based on her behavior, believed that she was on methamphetamine. Her doctor asked for a urine sample, which mother reluctantly agreed to provide. She then failed to produce enough urine for a proper test.

Between April and June 2013, DHS also attempted to obtain urine samples from mother on three occasions—having to catch her following visits with A because of her inability to maintain contact with her caseworker—but each time, mother was unable to produce a sample and offered a number of suspicious excuses as to why not. DHS then stopped trying to get a urine sample from mother. As a result, mother's last UA is from June 4, 2012, while she was in residential treatment at ARC.

DHS referred mother for a third psychological evaluation with Morrell in July 2013. On arriving, mother said

that she had lied during her last interview and wanted to correct it. However, Morrell observed that, instead, mother was in "self-advocacy" mode, showed "minimal insights in a host of areas," continued to blame others for her circumstances, and made statements inconsistent with her behavior throughout the reunification process. Because of mother's unreliable self-report, Morrell could not render any new diagnostic impressions. However, he noted that evidence suggested an additional diagnosis of impulse-control disorder NOS, characterized by pathological deception. Morrell concluded that mother "has remained stagnant and behaviorally disturbed throughout the reunification process" and that "[a]t this point, there can be no argument level that [mother] has worked appropriately toward reunification or is in any position to assume custody of this child."

Mother returned for mental health services with JCMH in July 2013, and began individual counseling with Waldo in September. Waldo observed that mother presented with symptoms of borderline personality disorder, post-traumatic stress disorder (PTSD), and ADHD. Waldo established a treatment plan for mother that included DBT for her borderline personality disorder. In October, mother agreed to attend weekly sessions with Waldo, but made no apparent progress as of the end of December 2013, and Waldo's notes indicated that mother spent her sessions blaming DHS and the courts for her problems.

Also in September 2013, mother did not contest a permanent placement of A with mother's sister (aunt). The placement fell through by early October because A developed severe behavioral problems during the transition, including inappropriate toileting, regression in learning, defiance, and tantrums. Then, in December 2013, the juvenile court entered an amended permanency judgment for A changing the plan from reunification to adoption. Mother agreed to the change in plan.

C. *Mother's efforts after DHS filed for termination*

In January 2014, DHS filed the petition to terminate mother's parental rights to A. As relevant on appeal, DHS alleged as follows in the termination petition:

"The parental rights of the mother to the above-named child should be terminated under ORS 419B.504 on the grounds that the mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including, but not limited to the following:

"a)   Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"b)   Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.

"c)   Failure to present a viable plan for the return of the child to the parent's care and custody.

"d)   Failure to learn or assume parenting and/or house-keeping skills sufficient to provide a safe and stable home for the raising of the child.

"e)   An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"f)   Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible.

"g)   Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

Between DHS's filing of the petition to terminate in January and the termination trial in July, mother for the first time began to show some limited mental health progress in DBT. Mother began DBT pretreatment in February 2014, and then began DBT the following month; DBT is a six-month program, with weekly group sessions. Mother attended fewer than half of the required sessions from March to April, although her attendance started to improve in May and June. Waldo had to have multiple discussions with mother about the attendance rules and being on time for both individual therapy and DBT. Waldo also referred mother for a psychiatric assessment in May, but mother

resisted scheduling an appointment until just before the termination trial.

At mother's psychiatric assessment, the evaluator determined that further testing was necessary to establish whether mother suffered from ADHD or other impulse control disorders. Mother was, once again, unable to provide a urine sample for a drug screen, and the evaluator would not prescribe any medications without one.

Mother has never attended parenting classes, as required by DHS; nor has she made any steps toward doing so. As of April 2014, mother reported continuing to smoke marijuana on a daily basis, and throughout her involvement with DHS, she has maintained that she needs marijuana to be emotionally stable, claiming at times that it makes her a "better parent." Also, throughout mother's involvement with DHS, mother has continued to devolve into yelling, crying, and blaming everyone else for her situation upon any contact with DHS. After the first year of DHS's involvement, mother refused to engage with DHS in identifying and utilizing services, believing that doing things her way is better for her.

D.  *Mother's interactions with A*

A and mother have had supervised visitation throughout A's time in nonrelative foster care. At first, mother would visit with A at grandmother's house with grandmother acting as supervisor. In March 2013, mother's expressions of hostility toward grandmother during a family decision meeting caused A's caseworker concern, so mother's visits with A were moved to DHS.

Throughout the time A was with her first foster parent, mother's visitation with A was "sporadic," which was hard for A and A would worry about whether mother would show up. This sporadic visitation continued when A transitioned to her second foster placement, in August 2012. A would be "crushed" whenever mother was late, but eventually A accepted that mother would be late or would fail to show. A's foster parent testified that A became indifferent about her mother not showing for visitation and was far more excited to visit grandmother. Because of mother's

sporadic and late attendance, mother had to sign a visitation contract that required her to call the morning of a scheduled visit and arrive 45 minutes early. Despite that agreement, mother would still continue to push the boundaries and come up with excuses as to why she could not follow the rules. Between October 2013 and May 2014, mother cancelled or failed to show up for half of her scheduled visits with A. The supervisor was concerned that mother could not put A's needs first, although mother did have appropriate and fun interactions with A when she did arrive for visits.

E.  *Mother's circumstances at the time of trial—July 2014*

At the time of trial, mother was scheduled to complete her initial DBT program in about two months, and she planned to engage in another six-month DBT program. Mother reported that DBT was improving her ability to regulate her emotions and that she is motivated because she now admits that she needs the treatment and that her mental health is an obstacle to her being a better parent. She also admitted to being easily overwhelmed.

Mother's DBT facilitator, Ulrey, testified that mother had improved her ability to stay on topic, stay present, and speak when appropriate, and that she currently has a good prognosis. Waldo testified that mother had "adequate" participation in DBT and had made "adequate" progress; she also stated that she thought it was possible that mother's work with JCMH would aid in reunification with A, but that mother needed to continue with treatment and get medication for ADHD. Waldo testified that there is no treatment for mother's ADHD other than medication, and that controlling mother's ADHD was the "main thing" because it is "therapy interfering behavior."

At trial, mother identified herself as an "addict" and admitted that she continued to smoke marijuana, including three days before the start of trial. She testified that she believes that marijuana does not interfere with her parenting A, but only gets in the way "to discover who I am." Mother claims that she has not used methamphetamine since April 2012, and she does not believe that she needs further drug treatment.

Mother admitted that she had not made any efforts to secure a place for her and A to live; however, she believed that she could find a place within three months. Mother also testified that grandmother's house is a safe and stable place for her and A to live, even though she admitted to fighting with grandmother, including a recent altercation in which she slapped grandmother. Mother has not sought employment since DHS's involvement, but she stated that she was involved with the JCMH jobs program. Records indicate that mother accessed JCMH's employment services only once—just before trial. Mother also testified that she would not be ready to parent A until after she completed another six-month DBT program.

Morrell also testified at the termination trial, having reviewed mother's most recent records from JCMH. Morrell acknowledged mother's recent progress with DBT, but testified that DBT is a "baby-step" process; it helps people with borderline personality disorder to regulate their behavior under stress. He testified that mother has a long way to go before she is competent to take on the task of responsible parenting because "that's a whole order of magnitude more challenging than just regulating your behavior under conditions of stress." In his opinion, mother cannot currently meet A's needs, and mother's personality disorder puts her at significant risk for putting her own relationships and need for attention above the welfare of A. In addition, Morrell testified that mother's ADHD is severe, made worse by marijuana use, and requires behavior therapy and psychostimulant medications that mother likely cannot get because of her substance abuse history. Assuming that mother stops her marijuana use, Morrell estimated three additional years until mother would be able to parent A; that is, one year of treatment for each of the three areas—DBT, lifestyle, and parenting—that mother needs to address.

F. *A's circumstances at the time of trial*

By the time of trial, A had experienced six transitions in care in the three and one-half years since her first removal from mother in November 2010, when she was two years old. Except for the period from January 2011 to May 2011, when A was placed back with mother, and one month

in the fall of 2013, when A was placed with her aunt, A has been in nonrelative foster care since November 2010. A's current placement is not a permanent one, so A will have to experience a least one more transition in care. Nonetheless, all witnesses agreed that A is a talkative, active, easy child with no current behavioral concerns.

In November 2013, Dwelle, a child psychologist, examined A. Dwelle observed that A had adjusted well to her current foster parent, to whom A is bonded as her primary caregiver, and that she had demonstrated resilience. A did report having frequent violent nightmares involving harm to grandmother. According to Dwelle, those nightmares reflect emotional distress that A is unable to express and is associated with her change in caregivers. A was uncomfortable talking about placement and her responses throughout the interview indicated that A was looking for stability and permanency, but did not see mother as that person. Dwelle testified that she did not believe that A was bonded to mother because a bonded child typically will be specific about wanting to be returned to the parent's care.

Dwelle rendered the opinion that A is at a vulnerable age for attachment and will have future difficulty with emotional and behavioral regulation. A's developmental window for reattaching to another primary caregiver is closing, and the longer permanency is delayed for A, the greater her risk for attachment difficulties and mental health issues. Dwelle did not believe that mother has made enough positive change to be a minimally effective parent and stated that her borderline personality disorder heightens the risk that mother would use A as a need-gratifying object and would often be overwhelmed by caring for A.

Morrell also reviewed Dwelle's evaluation of A and testified that, although A does not presently have a psychiatric diagnosis, her history of neglect is not "trivial" and a transition in care to mother would actualize A's current potential for psychological disturbance. He testified that it is critical for A to be placed in a setting that does not trigger that potential. Morrell also testified that being taken from her current placement will be traumatic for A and could trigger the same behaviors she exhibited when placed with her

aunt. Morrell opined that mother would be irritable having to care for A, which will cause A to be disruptive, unstable, anxious, and traumatized. Morrell feared placement with mother could "wreck" A.

A's current foster parent testified that A did not talk about wanting to live with mother until recently—in the last six weeks before trial—when she started talking about getting a "princess bed" at grandmother's house. Consistent with that observation, in June 2014, A also told an investigator that she wanted to live with mother and grandmother. A's foster parent testified that she believes A associates mom only with having fun, not with taking care of her. A's foster parent also testified that A needs permanency and requires a calm and structured environment "more than a typical child"—A is having separation anxiety, is scared people are going to leave her, is very sensitive to her environment, and has a somewhat heightened startle response. A's foster parent believes A will need mental health counseling to get through her next transition.

A's current caseworker testified that A is relatively well adjusted considering all of her placement changes, but that she is anxious about the future and needs caregivers who are calm, nurturing, and tuned into her needs. In her opinion, mother's mental health and untreated addiction render her "unpredictable, unreliable, chaotic and at times unable to perceive reality accurately."

After consideration of the evidence, the juvenile court denied DHS's petition to terminate mother's parental rights to A. Although the juvenile court determined that mother had engaged in the conduct and is characterized by the conditions alleged in the termination petition, the court concluded that DHS had not met its burden to prove that those conduct and conditions were seriously detrimental to A at the time of the termination hearing because "the record is lacking with respect to any specific cognizable mental or physical harm, or threat thereof, to [A]." Because of its determination that the state had failed to establish the first requirement for termination, the juvenile court did not reach the two additional inquiries required to terminate mother's parental rights.

## II. ANALYSIS

As previously noted, the state sought to terminate mother's parental rights based on unfitness under ORS 419B.504,[3] which requires a court to find that "(1) the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child; (2) integration of the child into the parent's care is improbable within a reasonable time due to conduct or conditions not likely to change; and (3) termination is in the best interests of the child." *Dept. of Human Services v. R. K.*, 271 Or App 83, 88, 351 P3d 68 (2015) (citing ORS 419B.500, ORS 419B.404, and *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001)).

The parties' arguments on appeal are focused on whether DHS met its burden of proof on the "seriously detrimental" requirement for termination. DHS and A both argue that the trial court erred by focusing on whether, by the time of the termination trial, A had manifested cognizable harm from mother's conduct or conditions, instead of assessing the potential future harm to A, which, they

---

[3] ORS 419B.504 provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child or ward.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."

argue, is established by the evidence. DHS and A also urge us to reach the two additional inquires for termination on *de novo* review, because the record is completely developed as to those matters. Mother responds that the juvenile court did, in fact, determine that there was no threat of future harm to A and that we should not disturb that finding on appeal.

As to whether a parent's conduct or condition is seriously detrimental to the child, we recently explained in *R. K.* that the apparent wellness of a child at the time of the termination trial is not determinative, because potential future harm can be sufficient:

> "In addressing the question of 'serious detriment,' the court focuses on the detrimental effect of the parent's conduct or condition on the child, 'not just the seriousness of the parent's conduct or condition in the abstract.' *Stillman,* 333 Or at 146. *A condition or conduct can be 'seriously detrimental' based on the potential for harm. State ex rel DHS v. Payne,* 192 Or App 470, 483, 86 P3d 87, *rev den,* 337 Or 160 (2004); *Caldwell v. Lucas,* 170 Or App 587, 600, 13 P3d 560 (2000), *rev den,* 332 Or 56 (2001) ('The law does not require a child to remain in a dangerous environment until the state can show harm to the child[.]'). The 'serious detriment' inquiry is 'child-specific,' and calls for testimony regarding the needs of the particular child. *State ex rel Dept. of Human Services v. Huston,* 203 Or App 640, 657, 126 P3d 710 (2006). Clear and convincing evidence of unfitness must exist at the time of the termination hearing; past unfitness is insufficient. *Id.* at 656. *But a child's apparent wellness at the time of trial, after removal from the parent's care, does not preclude a determination of serious detriment. Dept. of Human Services v. F. J. S.,* 259 Or App 565, 584, 315 P3d 433 (2013), *rev den,* 354 Or 840 (2014)."

*R. K.,* 271 Or App at 88-89 (emphasis addded).

We conclude that mother has engaged in conduct or is characterized by a condition that is seriously detrimental to A. We agree with the juvenile court that the evidence demonstrates that, up until trial, A has been an easy, resilient, and somewhat adaptable child, after being removed from mother's care at a young age and placed with stable, nonrelative foster parents for the past three and one-half

years. However, A's well-being in foster care does not preclude our determination that mother's conduct or conditions are seriously detrimental to A. *Id.* As discussed below, we base that determination on the child-specific evidence of harm to A as a result of mother's conduct and conditions, if A were returned to mother. *See, e.g., Dept. of Human Services v. J. L. H.*, 258 Or App 92, 104, 308 P3d 323 (2013) ("It is true, as mother asserts, that there is no evidence that KM has experienced significant ill effects as a result of his lifetime in foster care. And, because he came into foster care at birth, there is no evidence as to the effect of mother's condition on KM. Nonetheless, the evidence in this record shows that reuniting KM with mother would not be in his best interest and would be seriously detrimental to his physical and emotional health.").

It is the totality of the circumstances in this case and mother's inability to make any lasting changes—or even to admit that certain changes are necessary—that lead us to conclude that mother's conduct and conditions are seriously detrimental to A. Those conduct and conditions are mother's unmanaged drug use, including admitted daily marijuana use that interferes with her ability to address her mental health conditions and makes her ADHD worse, as well as a suspicious inability to provide useable urine samples for the last two years; long-term mental health conditions, including untreated ADHD and a borderline personality disorder, which have manifested, and continued to manifest at the time of trial, in a chaotic and unstable lifestyle; failure to provide any thought-out plan for reunification, stable housing, or source of support for her and A; failure to learn parenting skills; and an inability to commit to a long-term adjustment of her circumstances through participation in services.

As noted by Morrell, mother's personality profile is consistent with her stop-and-start treatment behavior that she has exhibited throughout the attempted reunification process. Although mother's recent engagement in DBT is encouraging, mother still continued to miss a significant number of appointments at JCMH, which indicates that she continues to engage in that same start-and-stop pattern.

We do not believe that mother has committed to any lasting changes that could address her significant mental health conditions; nor has she made any recent efforts to address her marijuana use which in itself interferes with her mental health treatment and which, Morrell testified, also makes her ADHD worse. As a result, we find clear and convincing evidence that, based on mother's history and current condition, mother would not be able to safely parent A, and would provide A with instability and exposure to a chaotic lifestyle, drug use, and conflict with grandmother, as mother has no thought-out plan for separate housing.

We also find that the record demonstrates by clear and convincing evidence that mother's conduct and conditions would be seriously detrimental to A, because A requires a stable, calm, child-focused primary caregiver to remain the healthy child she has become in foster care. Dwelle, Morrell, A's caseworker, and A's foster parent all testified that A requires a stable, calm, nurturing environment—more so than the typical child. Dwelle opined that A is at real risk for future emotional and behavioral regulation issues, attachment difficulties, and mental health issues if she is not placed in such an environment. That testimony is not merely speculation. When A tried to transition into the care of her aunt—a stable caregiver—she experienced such severe behavioral disturbances, including inappropriate toileting, learning regression, defiance, and tantrums, that her aunt had to return A to DHS. Although A's behavior resolved when she returned to the care of the foster parent to whom she was bonded, that foster parent testified that she believed that A would require mental health counseling to get through her next transition in care. Given mother's current condition, mother would not be able to provide A with the care she needs to get through another transition without lasting harm. Thus, the record contains child-specific evidence that demonstrates that mother is "unfit by reason of conduct or condition seriously detrimental to [A]."

Having concluded that mother is unfit, we determine that it is appropriate, on *de novo* review, to address the two additional inquiries necessary for termination—whether "integration of the child into the parent's care is improbable

within a reasonable time due to conduct or conditions not likely to change" and whether "termination is in the best interests of the child." The first inquiry requires us to "evaluate 'the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home "within a reasonable time."'" *R. K.*, 271 Or App at 89 (quoting *Stillman*, 333 Or at 145-46). The reasonable time standard is also child-specific. *Id.* at 89-90; *see also* ORS 419A.004(20) ("'Reasonable time' means a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments.").

A, at five and one-half years old, has been in non-relative foster care for over half her life. The evidence establishes that A is at a vulnerable stage in her development because, according to Dwelle, the window for her to form a new primary attachment is closing, making it important that A obtain permanency soon. Here, mother testified that she would be ready to parent A after completing a second six-month-long DBT program, which means that she would not be ready for at least another eight months. Even assuming that eight months would be a reasonable time for A, mother's prediction is not supported by any evidence, particularly in light of mother's three and one-half year history of repeatedly starting and stopping treatment, continued resistance to long-term change, and unwillingness to work with DHS to identify and access services. Given the complex interrelation of mother's conditions and that mother has only taken the first small step to effectively address them, we conclude that it is improbable that A can be integrated into mother's care within a reasonable time. *See, e.g.*, *R. K.*, 271 Or App at 93 (parent's recent progress in treatment and commitment to change does not overcome other evidence of unfitness and that, considering all the circumstances, it was improbable the child could be returned to the parent's care within a reasonable time).

We further conclude that, based on the same history and circumstances already discussed, the termination of mother's parental rights is in A's best interests. ORS 419B.500.

In sum, having reviewed the record *de novo*, we find on clear and convincing evidence that mother's conduct and condition is seriously detrimental to A and will not be resolved within a reasonable time and, further, that termination is in A's best interests.

Reversed.